WANG LABORATORIES, INC. vs. DOCKTOR PET CENTERS, INC.

Middlesex.   May 14, 1981. — July 6, 1981.

Present: ARMSTRONG, CUTTER, & BROWN, JJ.

*Contract,* Construction of contract.  *Practice, Civil,* Findings by judge.
  *Evidence,* Extrinsic affecting writing.

In an action to recover for rental payments under a written lease agree-
  ment for computer hardware, there was sufficient evidence to warrant
  findings that the written lease agreement was not an integrated con-
  tract intended by the parties to express their whole agreement and that
  there was a collateral oral agreement that successful completion of two
  operating cycles by the plaintiff's equipment was a condition essential
  to the defendant's obligation to make payments under the lease.
  [216-221]

CIVIL ACTION commenced in the Superior Court on Sep-
tember 15, 1975.

The case was heard by *Mitchell, J.*

*Donald N. Sweeney* for the plaintiff.

*Thomas R. Murtagh* for the defendant.

CUTTER, J.  The plaintiff (Wang) leased computer equip-
ment to Docktor Pet Centers, Inc. (DPC), and made an
agreement with DPC to maintain the equipment.  Wang's
action is to recover for rental payments under the written
lease agreement.  DPC has filed a counterclaim alleging
failure of Wang to get the system working on time or satis-
factorily and asks consequential damages of various types.
The case was heard (jury-waived) by a Superior Court
judge, who made findings.  Wang appeals from a judgment
allowing it only a limited recovery.  The counterclaim was
dismissed.

The complete evidence, including all exhibits, is before
us.  Wang introduced in evidence thirty-two requests for
admissions under Mass.R.Civ.P. 36, 365 Mass. 795 (1974),

which the judge found were admitted by DPC because never answered.[1] Wang's affirmative case essentially was based on these unanswered requests.

The evidence indicated that negotiations took place in November and December, 1973, among Wang, Engineering Computer Systems, Inc. (ECS), and DPC for the lease to DPC of Wang computer hardware and ECS software. Because of its financial position, DPC wanted to lease new computer equipment and to have Wang obtain ECS software and provide it under the proposed lease. Compare the situation discussed in *Patriot Gen. Life Ins. Co. v. CFC Inv. Co.*, 11 Mass. App. Ct. 857 (1981).

Over the objection of counsel for Wang, one Charm, then president of DPC, was allowed to testify in very general, ambiguous terms that, during the negotiations, Wang's representatives stated (a) Wang would obtain software from ECS and would take "systems responsibility" for the hardware and the software, and (b) "the system would operate on two successive operating cycles successfully, so that . . . [DPC] would be comfortable that . . . [it] got what . . . [it] paid for." An operating cycle was said to be about two months. The ambiguity of the first part of the testimony was somewhat dispelled by a letter of December 26, 1973, from Wang's representative to Charm at DPC reading in part: "Wang . . . will assume Systems Responsibility. This means that Wang will support hardware. Wang will also stand behind contractural [*sic*] agreements concerning soft-

---

[1] Wang's requests sought admissions of the contents and of authorized and authentic signatures in behalf of DPC of a lease agreement dated April 24, 1974, a maintenance agreement, acceptances of software benchmark demonstrations and applications of software, and a general acceptance of equipment form dated October 23, 1974. The requests also sought admissions (a) that all equipment was delivered in July, 1974, (b) of the minor specific amounts paid by DPC to Wang under the lease agreement and to ECS for software program work, (c) that no amounts had been paid to Wang under the lease agreement after April 24, 1974, or under the maintenance agreement, and (d) that Wang had honored all reasonable requests for service under the maintenance agreement.

ware specifications and completion dates reached between DPC and ECS." Wang, by counsel, conceded during trial, that it "had systems responsibility." There was until June 14, 1974, no attempt by Charm or DPC to support by correspondence Charm's ambiguous testimony about Wang's asserted representation that "two successful operating cycles would determine acceptance by" DPC, and that "the system would operate on two successive operating cycles successfully."

In the meantime, a partly printed written lease agreement was signed on April 24, 1974, by Wang and DPC. This agreement contained a provision in capital letters that Wang "makes no warranties regarding products manufactured by it or by others (including without implied limitation warranties as to merchantability, [or] fitness for a particular purpose . . .) express or implied, except as provided herein." Compare *Dekofski* v. *Leite*, 336 Mass. 127, 128-129 (1957). It also provided (in ordinary type) that Wang should not "be liable for incidental or consequential damages . . . arising out of the furnishing, performance or use of any product covered by this agreement." The sole warranty (§ 2 of Appendix A of the lease agreement) related to defects in materials and workmanship of "all products manufactured by [Wang] *but not by others*" (emphasis supplied) and extended for ninety days from the date of shipment and, for one year from the end of the warranty period, a promise to replace any such defective part without charge for the replacement part.

The lease agreement at first examination looks like a completely integrated contract between Wang and DPC. It contains no provision suggesting that any significance should be attached to the completion of two successive operating cycles successfully. It also, in § 12(*b*) in fine print, contains an express provision, "No representations, warranties, promises, guaranties or agreements, oral or written, express or implied, have been made with respect to the lease or equipment, except as expressly provided herein." This has many aspects of an integration provision.

On June 14, 1974, Charm of DPC wrote a long letter to one Carr of the Wang staff in which, referring to a negotiating meeting in April, 1974, he raised three points of which the second was that DPC's "lease payments were not to commence until after two complete cycles had been completed running parallel[2] on the Wang equipment." No reply to this letter is in the record, but Charm testified that Carr replied orally, "I understand what you said in your letter. I agree . . . that's what we said."

The trial judge, on the somewhat meager evidence just outlined, found that "in April, 1974, . . . it was agreed that lease payments by DPC were not to commence until after the successful running of two complete monthly operating cycles . . . and that the reports to be generated would be demonstrated to the satisfaction of DPC. The equipment was to begin full operation by October 1, 1974, the beginning of DPC's fiscal year."[3]

1. The initial (and essentially conclusive) question is whether the lease agreement of April 24, 1974, is an integrated contract intended by the parties to contain their whole agreement. The provisions from the agreement already quoted, especially § 12(b), would suggest that it was so intended. The testimony of Charm, accepted by the trial judge, is to the contrary. Some objections (concerning the deposit to be made by DPC) appear to have been made to the draft lease agreement as originally tendered, but this problem was corrected. DPC does not appear to have made

---

[2] This means using both the old and new equipment at the same time. See *Renfro Hosiery Mills Co.* v. *National Cash Register Co.,* 552 F.2d 1061, 1064 (4th Cir. 1977).

[3] In the letter of June 14, 1974, DPC was insisting that Wang had agreed to dispose of Burroughs equipment previously leased by DPC. That issue, not reflected in the lease agreement of April 24, 1974, appears to be no longer in dispute and, on that account, is not discussed in any detail in this opinion. A Wang letter to DPC of June 13, 1974, however, indicates that some negotiations concerning disposition of the Burroughs equipment in fact had taken place and that Wang (1) had agreed to "attempt to find a buyer" for the Burroughs equipment, and (2) indeed, had turned up a "potential buyer."

at that time any other objection to the content of the draft lease agreement. Charm also testified that a representative of Wang told him in late March, 1974, that DPC "had to sign the lease agreement . . . to keep the documentation and paper flow going."

It is far from clear to what extent the trial judge (cf. *Cormier* v. *Carty*, 381 Mass. 234, 235-238 [1980]) made an adequate and detailed comparison of the lease agreement with the contents of the supposed oral agreement, particularly that relating to the successful completion of two operating cycles. We attempt such a comparison to determine what matters the judge should appropriately have taken into account in deciding whether the lease agreement embodied all prior understandings:

(a) The lease agreement provided for a deposit by DPC of $3,210.93 "as payment of the first and last monthly rentals of the lease term" but that "[s]ubsequent rental payments will be due monthly beginning one month from the date of delivery." The copy of the lease agreement in the record shows in long-hand the words, "Start July 1, 1974," obviously a reference to the beginning of monthly rental payments. The "approximate delivery date" was listed as "5-1-74" and delivery in fact occurred on July 11 for Wang's hardware and on July 15 for the ECS software. The judge found that the "entire computer system was accepted in writing by DPC on October 23, 1974." The lease agreement itself contained no suggestion that it required any special type of testing of the equipment as a unit prior to its final acceptance or that any special period of error-free performance was to occur after its delivery to, and acceptance by, DPC.

(b) The lease agreement's sole express warranty in § 2 of Appendix A of the lease agreement applied only to "products manufactured by Wang." This would exclude, of course, any warranty in respect of software manufactured by ECS. This provision of the lease agreement may be inconsistent with the admitted obligation of Wang "to assume Systems Responsibility," if that term meant more than what

Wang's letter of December 26, 1973, said it meant, viz. "that Wang will support hardware" and "will also stand behind . . . agreements concerning software specifications and completion dates."[4]  The lease agreement contained no provision concerning the disposition of the Burroughs equipment (see note 2, *supra*) then leased by DPC. This raises the question whether the parties would naturally have included such a provision in a lease agreement of Wang equipment to DPC, if it had been intended to contain the whole agreement of Wang and DPC.[5]  The lease agreement was silent (except as already indicated) on what was to constitute acceptance of the system, although in that respect it may have relied upon general principles of law, including the analogy of the sales provisions of the Uniform Commercial Code, G. L. c. 106, §§ 2-607, 2-709.  See *Akron Brick & Block Co.* v. *Moniz Engr. Co.*, 365 Mass. 92, 93, 95 (1974).  See also Wenzel, The Extension of Article 2 of the Uniform Commercial Code to Leases of Goods, 12 Tulsa L.J. 556 (1977).  Compare *Dazien's Inc.* v. *Hodgman Rubber Co.*, 7 Mass. App. Ct. 901 (1979).

(c) The lease agreement, in part, was on a standardized printed form, a consideration given some weight by Restatement (Second) of Contracts § 211 (1981), with respect to some types of agreements.  Whether the form readily lent itself to inserting, in blanks of adequate size, special agreements of the type upon which DPC relies may have significance.

(d)  The nature of the parties themselves may be entitled to some weight.  As was suggested in *International Business Mach. Corp.* v. *Catamore Enterprises*, 548 F.2d 1065, 1073

---

[4] The software specifications are not before us.  Charm, during cross-examination, was not able to identify a volume about which Wang's counsel examined him, as constituting the specifications.

[5] The disposal of the Burroughs equipment was important to DPC because it could ill afford to lease two computers simultaneously, but a provision for its disposition would perhaps have been less relevant than the "two operating cycles" provision for inclusion in a lease of a Wang computer.

(1st Cir. 1976), cert. denied, 431 U.S. 960 (1977), "the significance to be accorded facially comprehensive written agreements between sophisticated corporate entities" is not to be "undervalued." The negotiations between Wang and DPC could have been found to have been of this type.

2. The Supreme Judicial Court said in *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847, 849 (1973), about an informal understanding which one of the parties contended had been integrated in a written agreement, "Whether there was an integration . . . was a question of the intention of the parties on which proof could be received ranging beyond the writing proper." See to the same effect *Carlo Bianchi & Co.* v. *Builders' Equip. & Supplies Co.*, 347 Mass. 636, 643 (1964). A similar initial inquiry (whether business letters, without any later formal contract, contained the entire agreement of the parties) was probably implicit in *Caputo* v. *Continental Constr. Corp.*, 340 Mass. 15, 18 (1959). See Restatement (Second) of Contracts §§ 209(2) and 214(a) and (b) (1981); 3 Corbin, Contracts §§ 576, 583, 585, 589 (1960); Leach & Liacos, Massachusetts Evidence 273-278 (4th ed. 1967). Thus, in this case, evidence of the negotiations was admissible at least so far as it had bearing upon the extent to which the lease agreement was intended as an integration of the prior undertakings of the parties.

Section 209(2) of Restatement (Second) of Contracts, *supra*, and the *Antonellis* case, 362 Mass., *supra* at 849-851, now make apparent that the issue of the extent of integration of understandings in a formal agreement is an issue of fact for the decision of the trial judge, entirely preliminary to any application of the parol evidence rule. It thus was for the trial judge to appraise and weigh (1) the lease agreement's exclusion of pertinent warranties and collateral promises; (2) DPC's acceptance of certain predelivery tests, and its more general written acceptance of October 23, 1974 (see note 1, *supra*); (3) the fact that the lease agreement contained no explicit terms concerning testing and acceptance, thus affording the possibility of a collateral

agreement on these subjects; (4) the failure of the lease agreement to discuss expressly Wang's "system responsibility" and the disposition of DPC's Burroughs equipment, two matters apparently of special concern to DPC; and (5) the fact that Wang called none of its negotiators as a witness to dispute Charm's testimony about the asserted test based on "two operating cycles." All these matters had bearing upon whether the lease agreement was an integrated expression of all the undertakings of the parties. That issue of fact the judge resolved against Wang. Thus it was open to him to find a collateral agreement that successful completion by Wang's equipment of two operating cycles was a "condition essential to DPC's obligation to make payment on the lease." Compare Restatement (Second) of Contracts § 217.

Different findings would have been warranted. In the circumstances, however, we cannot say that the trial judge's finding (based in part upon oral evidence) was "clearly erroneous" (Mass.R.Civ.P. 52, 365 Mass. 816 [1974]). See *Matsushita Elec. Corp. of America* v. *Sonus Corp.*, 362 Mass. 246, 254 (1972); *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977).

The judge's finding that the oral agreement was "collateral" implies that the written lease agreement did not express the parties' whole agreement and makes inapplicable cases relied upon by Wang, such as *Glackin* v. *Bennett*, 226 Mass. 316, 319-320 (1917); *Berman* v. *Geller*, 325 Mass. 377, 379-380 (1950); *Frick Co.* v. *New England Insulation Co.*, 347 Mass. 461, 466-468 (1964); *Canney* v. *New England Tel. & Tel. Co.*, 353 Mass. 158, 165 (1967); *Aerostatic Engr. Corp.* v. *Szczawinski*, 1 Mass. App. Ct. 141, 143 (1973). See *Johnson* v. *Worcester Business Dev. Corp.*, 1 Mass. App. Ct. 527, 529 (1973); *Finnerty* v. *Reed*, 2 Mass. App. Ct. 846, 847 (1974); *Charles A. Wright, Inc.* v. *F.D. Rich Co.*, 354 F.2d 710, 714-715 (1st Cir. 1966). Compare cases arising under the Uniform Commercial Code, G. L. c. 106, § 2-202; *Luria Bros.* v. *Pielet Bros. Scrap Iron & Metal*, 600 F.2d 103, 110-111 (7th Cir. 1979). Com-

pare also cases involving the effect of the parol evidence rule on the interpretation of doubtful language in a written agreement, e.g. *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 755-756 (1973); *Bendetson* v. *Coolidge*, 7 Mass. App. Ct. 798, 802-803 (1979).

3. On the conflicting evidence which showed a substantial number of DPC's difficulties with, and various failures of performance by, Wang's system, the trial judge was warranted in finding, as he did, that "DPC never received two successful operating cycles from the Wang system." The facts which would give rise to DPC's obligation to continue to pay rent, under the oral agreement found by the trial judge, thus never occurred. The judge's findings of damages (from which DPC has claimed no appeal) have not been shown to have been erroneous.

*Judgment affirmed.*