# DECISIONS

OF THE

## APPEALS COURT

OF

## MASSACHUSETTS

---

### DARRELL GREEN vs. HARVARD VANGUARD MEDICAL ASSOCIATES, INC.

No. 09-P-2092.

Norfolk. November 18, 2010. - March 3, 2011.

Present: LENK, VUONO, & RUBIN, JJ.

*Anti-Discrimination Law,* Race. *Employment,* Discrimination, Retaliation. *Contract,* Performance and breach. *Fraud.*

In a civil action alleging discrimination in employment based on race, the judge erred in granting summary judgment in favor of the defendant employer on the employee's claim of a hostile work environment, where, as a matter of law, a supervisor's use of an offensive and hurtful racial epithet in a single, brief conversation was sufficiently severe or pervasive to give rise to a claim of a racially hostile work environment, and a release contained in a salary continuation agreement that the plaintiff employee signed did not bar such a claim, in that genuine issues of material fact existed whether the parties intended that agreement to be a complete and integrated contract; whether the employer committed a breach of that agreement by failing to provide the employee with suitable employment; and whether the employer fraudulently induced the employee to sign the release contained in the agreement. [7-13]

In a civil action alleging discrimination in employment based on race, the judge erred in granting summary judgment in favor of the defendant employer on

the employee's claim of retaliation, where genuine issues of material fact existed whether the employee was intentionally recommended for and hired into a job for which he was not qualified and from which he was consequently bound to separate such that his resignation amounted to a constructive discharge, and whether the employer's decision to take this course of action was a result of the employee's having complained about his supervisor's allegedly racially discriminatory conduct. [13-14]

CIVIL ACTION commenced in the Superior Court Department on April 9, 2008.

The case was heard by *Janet L. Sanders, J.*, on a motion for summary judgment.

*Christopher J. Trombetta* for the plaintiff.

*Eugene J. Sullivan, III*, for the defendant.

RUBIN, J. For the third time in as many years, we address an antidiscrimination suit under G. L. c. 151B involving the alleged workplace use against an African American of the racial epithet that is widely regarded as the most hateful and offensive in our culture. See *Thomas O'Connor Constructors, Inc.* v. *Massachusetts Commn. Against Discrimination*, 72 Mass. App. Ct. 549 (2008); *Augis Corp.* v. *Massachusetts Commn. Against Discrimination*, 75 Mass. App. Ct. 398 (2009). Here, the Superior Court judge granted summary judgment in favor of the defendant, Harvard Vanguard Medical Associates, Inc. (Harvard Vanguard). The plaintiff, Darrell Green, now appeals.

In reviewing an order granting summary judgment, as we do in this case, the standard of review is the familiar one. We review de novo the propriety of the order granting summary judgment, viewing the evidence in the summary judgment record in the light most favorable to the nonmoving party, in this case the plaintiff. See *Gray* v. *Giroux*, 49 Mass. App. Ct. 436, 438 (2000).

I.

The summary judgment record reveals the following: Green applied for a position and was hired in June, 2005, by Harvard Vanguard to work as a medical secretary in Harvard Vanguard's physical therapy department at its Kenmore Square location. According to Green's affidavit, Mary Beth Walsh, who was to be his supervisor, told him that, although the job formally was

for only twenty hours per week, Green would be able to work forty hours per week. Green accepted the position based on that representation.

Green completed not only secretarial tasks in the position but assisted with other needs of the physical therapy department. According to Green's affidavit, Walsh praised Green for his performance and did not criticize him or his work. Walsh, however, only inconsistently provided additional work for Green above the twenty hours required by the job. Without the twenty additional hours per week, Green was unable to earn sufficient income to support himself or his child.

It is undisputed that sometime in August, 2005, Green went to Harvard Vanguard's human resources department, where he spoke with Michelle Guarnieri, who worked in that department.[1] Green informed Guarnieri that Walsh had promised him twenty additional hours of work each week but that she had failed to provide him with that work. Guarnieri indicated that Walsh had neither the authority nor the ability to promise these additional hours. Subsequently, Guarnieri apparently informed Walsh about her conversation with Green.

According to Green, shortly after he spoke with Guarnieri, near the end of a work day, Walsh walked up to him, stood very close within his personal space, pointed her finger at his face, and yelled at him, saying, "How dare you go to Human Resources and report me." Green responded that all he wanted was a forty-hour work week, which is what he was told he would be given when he started working. Walsh responded, "You're not going to get it. Now I don't even want to see you. Who do you think you are? Who do you think they are going to believe, me, a valued employee of over ten years or a dirty fucking nigger?"

The parties agree that Green immediately reported this alleged incident to the human resources department.[2] According to Green, Walsh subsequently issued Green a "letter of concern." This letter outlined alleged deficiencies in job performance that were

---

[1]Guarnieri subsequently changed her last name. For the sake of consistency we will refer to her throughout this opinion by the name she used at the time of these initial events, Guarnieri.

[2]In her affidavit, Guarnieri testified that Green did not tell her that Walsh had used the words "dirty fucking" to modify the racial epithet.

purported to have occurred prior to the angry interaction between Walsh and Green. One involved calling in sick, which Walsh wrote that Green, as a probationary employee, was not permitted to do. The second involved an allegation that Green interrupted a conversation between an optical department supervisor and a patient in order to seek reimbursement for eyeglasses that Green had obtained as a Harvard Vanguard patient prior to his employment by Harvard Vanguard.

According to Guarnieri's own affidavit, after Green spoke with her about the incident with Walsh, she "decided that it would not be in [Harvard Vanguard's] best interest to continue to employ him." She asserts that this conclusion was not made in retaliation for his reporting the incident, but was based upon the behavior described in Walsh's letter of concern as well as certain other alleged workplace incidents.

According to Green's testimony, Guarnieri told Green that he would have to avoid Walsh and that Walsh intended to force Green out of Harvard Vanguard. Subsequently, Guarnieri indicated to Green that in order to avoid remaining in Walsh's department, he would have to resign his position. Green testified that he was told that this measure would be temporary and that Harvard Vanguard would rehire him to a future position as soon as one became available. Although the "letter of concern" extended Green's time as a probationary employee — and thus extended the time until he could become a member of the union — according to Green, Guarnieri indicated that in the new position he would be able to work the time necessary for union admission. Green also testified that Guarnieri told him that he would be paid while he awaited this new position and that he would not lose any compensation or benefits.

Green agreed to this proposal. At Guarnieri's request he signed a letter of resignation. He also signed a "salary continuation agreement" (agreement). It provided that for four weeks, or until Green commenced other employment comparable to his position as a medical secretary, Harvard Vanguard would continue to pay Green's salary and would pay for his health insurance. Contrary to Green's testimony, Guarnieri testified in her affidavit that, upon providing Green the agreement, she told him that after his resignation he could apply for jobs at Harvard Vanguard on the same basis as anyone else.

The agreement also contained a clause entitled "Release." This clause states that "[t]his Agreement constitutes the entire agreement between Mr. Green and [Harvard Vanguard] with respect to all matters pertaining hereto and provides the only benefits that Mr. Green shall receive in connection with his resignation and is in full settlement of all claims Mr. Green now has or may have against [Harvard Vanguard]. Mr. Green agrees to release and forever discharge [Harvard Vanguard]" from any claims that he may have had "by reason of any cause or matter occurring on or prior to the date of this Agreement." The agreement was executed on August 30, 2005, by Harvard Vanguard and was signed by Green on September 2, 2005.

According to Green, while he was still receiving the four weeks' pay referenced in the agreement, Guarnieri called him and offered him a position, for which he had not applied, as a medical assistant in the cardiology department. This was a full time, forty hours per week position. Green's assertion that he had not applied for this position is supported by a detailed listing of his applications for positions at Harvard Vanguard produced during discovery that does not indicate that he applied for the cardiology department position.

The job description for this position indicates that among the essential functions of the job are "[o]btain[ing] relevant information and tak[ing] vital signs"; possibly "advis[ing] patient[s] of preparation required for" examinations or additional testing specific to the cardiology department; obtaining "information from or providing information to outside doctors, hospitals, health or social service agencies, and insurance agencies"; answering telephones in conformance with "emergency and departmental protocols"; "relay[ing] messages to providers"; "[a]ssist[ing] with data collection activities for statistical reports or required studies"; and "ensuring data is properly collected and accurate." A bachelor's degree, an associate's degree in medical assisting, or completion of a certificate program were preferred qualifications for the job, and Green testified that all the other individuals holding the same position had such qualifications.

According to Green, who has an associate's degree in electrical engineering from Wentworth Institute of Technology and whose prior customer service experience was limited to many

years of work in the travel industry, he told Guarnieri that he was not qualified for the position that she had suggested. Guarnieri, however, told him not to worry. According to Green's deposition, she told Green that he would receive training such that his asserted lack of qualifications would not be an issue.

According to the affidavit of Zufan Araya, the supervisor of the cardiology department at Harvard Vanguard's Kenmore Square location, Guarnieri called Araya about Green. Araya testified in the affidavit that Guarnieri strongly recommended Green for the medical assistant position due to his experience in his position in the physical therapy department and said that he would be a good fit for answering patients' telephone calls in the cardiology department. According to Araya, Guarnieri did not tell Araya of any of the problems in his prior employment at Harvard Vanguard that Guarnieri herself describes in her affidavit. Indeed, Araya's affidavit states that Guarnieri did not say anything negative about Green. Araya testified that she was not aware that Green had resigned his prior position, nor was she aware of any alleged performance issues Green had had there.

After meeting Green for an interview, Araya hired him for the medical assistant position. After several days of training, Green joined the cardiology department. As part of his responsibilities, he was required to answer the telephone and to communicate with patients with respect to their heart conditions. According to Green, he did not understand the terminology concerning the nature of the conditions or of their treatment. At one point, according to Green's affidavit, a coworker told a patient that Green was "an idiot."

Less than two weeks after Green joined the cardiology department, on October 12, 2005, his supervisor, Araya, issued him a "letter of concern." This letter referred to incidents on October 5 and 6. With respect to the incident on October 6, the letter described Green speaking to a caller while a medical assistant training him was listening in. The medical assistant would feed Green information to repeat to the caller. Rather than attempting to repeat the directive, Green asked the caller "if they heard what the assistant said." With respect to the October 5 incident, the letter asserts that while speaking in the same circumstances to a patient with whom there was a "clear language barrier," Green failed to address the patient as "sir," as directed by the

assistant, but instead continued to attempt to pronounce the patient's last name.

In his affidavit, Green stated that both incidents resulted from his inability to understand and use the necessary medical terminology. He asserted that this was the basis of the October 6 incident, and that the problem on October 5 did not actually concern the pronunciation of the patient's last name but rather, again, the meaning and use of medical terminology.

On the same day in which he received the letter of concern, Green spoke with Guarnieri. According to his affidavit, he explained that he did not understand the terminology being used in the cardiology department. She indicated that he would be unable to continue in the new position. When he asked if he could obtain a position in a different department instead, Guarnieri said no. She said, "They don't want you here."

Guarnieri indicated to Green that he should sign a letter of resignation, apparently so that he would be eligible for severance payments, and Green did so. Guarnieri also told Green that he would have to sign another release in order to obtain severance payments. Green refused to sign any such release. Harvard Vanguard nonetheless did make severance payments to Green.

## II.

Green brought this action for racial discrimination in employment in violation of G. L. c. 151B.[3] He alleges both that Harvard Vanguard subjected him to a hostile work environment while he worked in the physical therapy department under Walsh, see *Thomas O'Connor Constructors, Inc.* v. *Massachusetts Commn. Against Discrimination*, 72 Mass. App. Ct. at 560, and that it retaliated against him for his assertion of his discrimination claim.

A. *Hostile environment discrimination.* There can be no doubt that if the facts recited above were proven at trial, they would suffice, in the absence of the release contained in the agreement, to support a finding of liability on the part of Harvard

---

[3]The complaint also includes a claim for common-law fraud. Claims for intentional and negligent infliction of emotional distress were dismissed at an earlier stage of the proceedings, and Green does not argue on appeal that this was error.

Vanguard for racial discrimination against Green in violation of G. L. c. 151B, § 4(1), during his employment in its physical therapy department. See *Augis Corp.* v. *Massachusetts Commn. Against Discrimination*, 75 Mass. App. Ct. at 408-409.

As we explained just last year, "a supervisor who calls a black subordinate a 'fucking nigger' has engaged in conduct so powerfully offensive" that liability for racial discrimination under G. L. c. 151B, § 4, may be based "on a single instance. That term inflicts cruel injury by its very utterance. It is degrading, it is humiliating, and it is freighted with a long and shameful history of humiliation, the ugly effects of which continue to haunt us all. The words have no legitimate place in the working environment — indeed, they have no legitimate place — and there is no conceivable justification for their use by a workplace supervisor." *Ibid.*

Harvard Vanguard does not argue, as it did below, before our decision in *Augis*, that, as a matter of law, a supervisor's use of the language alleged in a single "two to three minute" private conversation is not sufficiently "severe or pervasive" to give rise to a claim of a racially hostile work environment. See *Thomas O'Connor Constructors, Inc.* v. *Massachusetts Commn. Against Discrimination*, 72 Mass. App. Ct. at 560 (stating that discrimination must be severe or pervasive to amount to actionable discrimination). The use of these disgusting, demeaning, and humiliating words, and the impact of their use upon those to whom they are directed, is a grave matter. Among the purposes of our Commonwealth's antidiscrimination laws is the elimination from the workplace of this offensive and hurtful racial epithet — and of all others — and of the discriminatory injury inhering in their use.

Harvard Vanguard does not disagree, but argues that the release contained in the agreement bars any discrimination claim based upon Walsh's alleged conduct while Green worked in its physical therapy department because any such conduct occurred prior to the signing of the agreement. Green disagrees. He argues that there are genuine issues of material fact both whether the defendant breached its agreement with him by failing to provide him with a suitable new position, and whether he was fraudulently induced into signing the release.[4]

---

[4]Green does not contend that the language of the release would otherwise

1. *Breach of the agreement.* Harvard Vanguard asserts that the release in the agreement bars Green from raising a discrimination claim against it based upon its treatment of Green prior to the date on which the agreement was executed, including the entire period when he was employed in the physical therapy department. Green, however, alleges that at the same time he signed the agreement, the defendant orally undertook, as part of the agreement between the parties, the obligation to find him a suitable position elsewhere at Harvard Vanguard, and that it breached this obligation. A material breach by Harvard Vanguard of its agreement with Green would excuse Green from his obligations under the agreement. See, e.g., *Prozinski* v. *Northeast Real Estate Servs., LLC*, 59 Mass. App. Ct. 599, 610 (2003); *Ward* v. *American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100 (1983) ("It is well established that a material breach by one party excuses the other party from further performance under the contract").

Harvard Vanguard points to the language of the release and argues that it resolves the question. In essence, this amounts to an argument that the agreement is a complete and integrated contract, and that any oral promises made to Green are irrelevant.

Whether an agreement is integrated "is an issue of fact for the decision of the trial judge, entirely preliminary to any application of the parol evidence rule." *Wang Labs., Inc.* v. *Docktor Pet Centers, Inc.*, 12 Mass. App. Ct. 213, 219 (1981). It is "a question of fact which turns upon the intention of the parties." *Holmes Realty Trust* v. *Granite City Storage Co.*, 25 Mass. App. Ct. 272, 275 (1988).

The judge was not asked to, and did not, make a determination on the question of integration. Nor would one have been appropriate at this stage of the proceedings based solely on the summary judgment record. As this court's decisions have made clear, even apparently straightforward contractual language asserting integration will not always compel a conclusion that a writing reflects a complete and integrated agreement. Thus, for example, in *Holmes Realty Trust*, despite a contract containing

be inadequate to bar his discrimination claim, and we therefore express no opinion on the question. See *Melanson* v. *Browning-Ferris Indus., Inc.*, 281 F.3d 272, 276 (1st Cir. 2002) (utilizing a "totality of the circumstances" approach to assess the validity of a release).

clear language asserted to demonstrate integration, we found summary judgment based on the agreement being complete and integrated inappropriate. See *ibid.*[5]

Green testified in his affidavit that he was in fact promised in return for his resignation and his signing the agreement not only four weeks' severance, but that he would be given another job that would be suitable to allow him to continue his employment at Harvard Vanguard, to retain his benefits, and to become eligible for union membership. Guarnieri, on the other hand, testified that contemporaneous with asking Green to sign the release, she told him only that after his resignation he could apply for jobs at Harvard Vanguard on the same basis as anyone else. Indeed, it is her testimony that she had determined that he should not be employed at Harvard Vanguard. Consistent with Green's testimony, however, there is also evidence in the summary judgment record both that Green did not apply for the medical assistant job in cardiology for which he was subsequently hired, and that Guarnieri made an unsolicited call to Araya urging her to hire Green and vouching for Green's qualifications as a potential employee. During this conversation, Guarnieri did not indicate to Araya that Green had had any performance issues in his job in the physical therapy department.

Summary judgment is not a stage at which these factual

---

[5]The contract at issue in *Holmes Realty Trust* stated that it "shall constitute the only agreement between the parties relative to the demised premises and no oral statements and no prior written matter not specifically incorporated herein shall be of any force or effect. In entering into this [contract], the [nonmoving party] relies solely upon the representations and agreements contained herein." 25 Mass. App. Ct. at 275. We concluded that "[n]otwithstanding the plain language of the [contract] . . . the circumstances attendant upon its execution and the language of the exchange agreement, viewed in a light favorable to [the nonmoving party], suggest the existence at least of an ambiguity in the meaning of the lease in the over-all context. . . . It would be open to a fact finder examining the language of the [contract] and the [other simultaneously executed] agreement to treat them as intended by the parties to be parts of a single transaction." *Id.* at 275-276. See *Wang Labs., Inc.* v. *Docktor Pet Centers, Inc.*, 12 Mass. App. Ct. at 215, 217-220 (upholding judge's factual finding that an agreement that "at first examination looks like a completely integrated contract" was not a complete and integrated agreement; outlining some of the factors to be considered in making such a determination; and concluding that "evidence of the negotiations was admissible at least so far as it had bearing upon the extent to which the lease agreement was intended as an integration of the prior undertakings of the parties").

disputes may be resolved. Taking the evidence and the reasonable inferences that can be drawn therefrom in the light most favorable to Green, a judge could conclude that it was not the intent of the parties that the agreement was a complete and integrated contract, and a jury could subsequently conclude that the agreement between Green and Harvard Vanguard included the promises he describes. Likewise there is sufficient evidence in the summary judgment record to support a conclusion that Harvard Vanguard breached its agreement by failing to provide Green with suitable employment: the summary judgment record reveals a genuine issue of material fact about whether the position given Green at Guarnieri's urging was one in which he could have succeeded or was, rather, one in which, in light of his lack of training, he was doomed to fail.

If a jury found such a breach, it would excuse Green from his obligation to honor the release agreement, and the jury properly could address on the merits Green's hostile work environment claim based on his treatment while employed in Harvard Vanguard's physical therapy department.

2. *Fraud in the inducement.* The summary judgment record, again taken in the light most favorable to Green, also reveals a genuine issue of material fact as to whether Green was fraudulently induced to sign the release. It is black-letter law that an agreement like the one he signed is voidable by a party who is fraudulently induced to enter into it. See *John Hancock Mut. Life Ins. Co.* v. *Banerji*, 62 Mass. App. Ct. 906, 909 (2004).

Guarnieri's own testimony is that at the time Green resigned from his position in the physical therapy department, she had concluded that Green was not a suitable employee at Harvard Vanguard. This, combined with the evidence in the record of the ensuing course of events, would support an inference that she did not have the intention to find suitable employment for Green. If the jury were to draw this inference and to find further that Guarnieri induced Green to sign the release on the promise of such employment — extrinsic evidence of which would be admissible to show fraud even in the face of a complete and integrated agreement, see *Shawmut-Canton LLC* v. *Great Spring Waters of Am., Inc.*, 62 Mass. App. Ct. 330, 335 (2004) — the jury could also find that he had been fraudulently induced to sign the release.

If a jury were to find that the defendant was fraudulently induced into signing the release agreement, the agreement would, for this independent reason, again stand as no bar to Green's claim of hostile environment racial discrimination during his employment by Harvard Vanguard in the physical therapy department.[6]

Harvard Vanguard argues that even if it fraudulently induced Green to enter into the release, Green "ratified" the agreement by his failure to tender back to it the four weeks' severance he was paid, a benefit he received under the agreement. See, e.g., *Cabot Corp.* v. *AVX Corp.*, 448 Mass. 629, 643 (2007). The scope of the tender-back requirement for one seeking to avoid a release — rather than some other kind of contract — is not as clear as Harvard Vanguard implies. See, e.g., *Hogue* v. *Southern Ry. Co.*, 390 U.S. 516, 517 (1968) (per curiam) (indicating that the common-law tender-back requirement is inapplicable and that a release may not be relied upon at all "where fraud enters into the execution of the release"); *Graham* v. *Atchison, T. & S.F. Ry. Co.*, 176 F.2d 819, 826 (9th Cir. 1949) (same); Restatement (Second) of Contracts § 85 comment b (1981) (a promise ratifying a voidable contract "may itself be voidable for the same reason as the original promise, or it may be voidable or unenforceable for some other reason").[7] Nonetheless, we may assume for purposes of this decision, without deciding, that a failure to tender back benefits of a release from claims under

---

[6]For the same reasons that there is a genuine issue of material fact whether Green was fraudulently induced to enter the agreement containing the release, there is a genuine issue of material fact with respect to his common-law claim of fraud. See *Masingill* v. *EMC Corp.*, 449 Mass. 532, 540 (2007).

[7]Courts have held that the tender-back requirement may not be applied to allow reliance on voidable releases from claims under certain remedial statutes, including antidiscrimination statutes, because it is not consistent with the purposes of the statute. See, e.g., *Hogue* v. *Southern Ry. Co.*, 390 U.S. 516 (1968) (Federal Employers' Liability Act); *Forbus* v. *Sears Roebuck & Co.*, 958 F.2d 1036 (11th Cir. 1992) (Age Discrimination in Employment Act [ADEA]). (Subsequent to *Forbus*, Congress adopted the Older Workers Benefit Protection Act [OWBPA], which set out specific requirements for ADEA releases; in *Oubre* v. *Entergy Operations, Inc.*, 522 U.S. 422, 426-427 [1997], the OWBPA was held to replace any common-law contract rule imposing a tender-back requirement.) We need not decide, and express no opinion on, the applicability of the tender-back requirement in cases involving voidable releases of claims under G. L c. 151B.

§ 151B that was induced by fraud might in some circumstances amount to ratification of the release.

As the Supreme Judicial Court has noted, "an intention to ratify is 'an essential element and is at the foundation of the doctrine of waiver or ratification.' " *Cabot Corp.* v. *AVX Corp.*, 448 Mass. at 645, quoting from Annot., Ratification of Contract Voidable for Duress, 77 A.L.R.2d 426, 434 (1961). For purposes of Harvard Vanguard's argument, we must assume that Harvard Vanguard did, indeed, fraudulently induce Green to release his claim for employment discrimination. An intent to ratify "may be shown by 'conduct inconsistent with any other hypothesis than that of approval.' " See *ibid.*, quoting from Annot., Ratification of Contract Voidable for Duress, 77 A.L.R.2d at 434. In the circumstances of this case, Green's merely retaining four weeks' severance pay is not inconsistent with any hypothesis other than approval of the release.[8] The retention of that pay cannot, standing alone, support a finding as a matter of law that Green intended to ratify what, by hypothesis, was a fraudulently induced release of his claims of discrimination.[9]

B. *Retaliation claim.* Harvard Vanguard argues that it is entitled to summary judgment with respect to Green's claim of retaliation under G. L. c. 151B, § 4(4). An employer may not "discharge, expel or otherwise discriminate against any person . . . because he has filed a complaint, testified or assisted in any

---

[8]In particular, the summary judgment record indicates the payments may have been spent. Cf., e.g., *Oubre* v. *Entergy Operations, Inc.*, 522 U.S. at 426-427 ("In many instances a discharged employee likely will have spent the moneys received and will lack the means to tender their return").

[9]Harvard Vanguard also argues that Green ratified the agreement by failing to repudiate the agreement within a reasonable time. Assuming again without deciding that the requirement for certain voidable contracts — that repudiation must be undertaken in a reasonable time or the contract may be deemed ratified, see *Cabot Corp.* v. *AVX Corp.*, 448 Mass. at 644-645 — applies to the release, Green did not fail to repudiate it within a reasonable time. He promptly filed a claim with the Massachusetts Commission Against Discrimination (MCAD) against Harvard Vanguard in December, 2005, and filed this suit less than eight months after the conclusion of the MCAD proceeding. During the time prior to his filing suit he did not accept further benefits under the contract, nor did he take any other action indicating a position that the contract was binding; he was not able to speculate at Harvard Vanguard's risk; and Harvard Vanguard took no action in justifiable reliance on the validity of the release. See *ibid.*; Restatement (Second) of Contracts § 381.

proceeding under section five." G. L. c. 151B, § 4(4). "A retaliation claim under c. 151B must fulfill three elements: (1) the employee engaged in a protected activity; (2) the employee faced an adverse employment consequence; and (3) the protected activity caused the adverse employment action." *Ciccarelli* v. *School Dept. of Lowell,* 70 Mass. App. Ct. 787, 791 (2007). Green's complaint to the human resources department about Walsh's conduct — a "complaint" about allegedly racially discriminatory conduct by a supervisor — is clearly protected activity. See *Clifton* v. *Massachusetts Bay Transp. Authy.,* 445 Mass. 611, 613-617 (2005).

Harvard Vanguard argues that it engaged in no retaliation against Green subsequent to the execution of the release agreement. It argues that he faced no discriminatory actions during the time he worked in the cardiology department and that his supervisor in that new position knew nothing about his previous supervisor's conduct or the claim of discrimination he had made.

This argument misperceives the nature of Green's retaliation claim. His allegation is that he was ultimately terminated by Harvard Vanguard in retaliation for his having filed his complaint about alleged racial discrimination. Given the evidence in the summary judgment record, there is a genuine issue of material fact whether Green was intentionally recommended for (and subsequently hired into) a job for which he was not qualified and from which he was consequently bound to separate such that his resignation from that position amounted to constructive discharge — an adverse employment consequence — and whether Harvard Vanguard's decision to take this course of action was a result of his having complained about his supervisor's alleged racially discriminatory conduct.[10] Summary judgment therefore should not have been granted on Green's retaliation claim.

---

[10]Harvard Vanguard argues that Green cannot establish that he was constructively discharged from the position in the cardiology department, from which, formally, he resigned, because he cannot demonstrate that his working conditions in the second job were not tolerable. Harvard Vanguard bases this assertion on Green's deposition testimony that he did not find it "intolerable" in the cardiology department. It is clear from the deposition testimony, read in context, that all Green was saying was that conditions in the cardiology department were not oppressive or abusive. Constructive discharge through placement in a job that is "intolerable" may be shown by a deliberate placement in a job for which one is not qualified and that one is unable to perform,

### III.

Because the summary judgment record, read in the light most favorable to the plaintiff, as the nonmoving party, reveals genuine issues of material fact, the plaintiff's claims require trial. The judgment is reversed.

*So ordered.*

---

regardless of whether the environment is intolerably abusive or oppressive. See *GTE Prods. Corp.* v. *Stewart*, 421 Mass. 22, 34 (1995), quoting from *Rosado* v. *Santiago*, 562 F.2d 114, 119 (1st Cir. 1977) (constructive discharge occurs where, inter alia, work conditions are "so difficult . . . that a reasonable person in the employee's shoes would have felt compelled to resign").