NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-252                                             Appeals Court

REALTY FINANCE HOLDINGS, LLC[1] vs.  KS SHIRAZ MANAGER, LLC, &
others.[2]


No. 13-P-252.

Suffolk.     January 9, 2014.  -  September 5, 2014.

Present:  Katzmann, Fecteau, & Milkey, JJ.


Contract, What constitutes, Condition precedent, Choice of law
     clause, Damages.  Evidence, Parol evidence.  Practice,
     Civil, Summary judgment.  Damages, Breach of contract.



     Civil action commenced in the Superior Court Department on
August 21, 2008.

     The case was heard by Charles T. Spurlock, J., on a motion
for summary judgment; a hearing on the assessment of damages was
had before Carol S. Ball, J., and entry of final judgment was
ordered by her.

---

[1] We use the plaintiff's name as it appears on an assented-
to motion to reflect the plaintiff's change of name in
subsequent pleadings, which was allowed by a judge in the
Superior Court on February 5, 2009.  The assented-to motion also
required changes in the names of certain of the defendants, and
those changes are also reflected in our caption.

[2] KS Shiraz Equity Partners, LLC; KS-RFC Shiraz, LLC; KS GS
Manager, LLC; KS GS Equity Partners, LLC; and KS-RFC GS, LLC.

Jeffrey P. Allen (Maria Galvagna Mesinger with him) for the defendants.
Paul S. Samson for the plaintiff.

KATZMANN, J.  In this appeal, the parties dispute whether two thirty-eight page limited liability company agreements, negotiated and drafted with the assistance of counsel and each containing an integration clause, should be enforced as written. A Superior Court judge entered summary judgment for the plaintiff, ruling that the agreements were fully integrated contracts and that the parol evidence rule prohibited consideration of the parties' negotiations to show that the agreements were subject to contingencies.  A final judgment then entered awarding damages to the plaintiff.  On appeal, the defendants argue that it was always understood that the agreements, though fully executed, were not to take effect until certain financing and property acquisitions were in place and that electronic mail message (e-mail) exchanges between the parties raise genuine issues of material fact whether integration was intended.  The defendants further maintain that the plaintiff is not entitled to damages under the terms of the agreements.  We affirm.

1.  Facts.  We take the undisputed facts from the judge's February 1, 2010, "Memorandum and Order on the Plaintiff's Motion for Summary Judgment on Liability" and from the parties'

statement of undisputed facts.  We also add material from the record for purposes of background and discussion, as noted. During the relevant events of this case, the plaintiff was a Delaware limited liability company involved in real estate specialty finance.[3]  The defendants are related Massachusetts entities involved in real estate acquisition and management. Kambiz Shahbazi is the principal of KS GS Manager, LLC; KS GS Equity Partners, LLC; KS Shiraz Manager, LLC; and KS Shiraz Equity Patners, LLC, the entities that control the daily operations of the real estate portfolios owned by KS-RFC GS, LLC (GS Company), and KS-RFC Shiraz, LLC (Shiraz Company) (collectively, the defendants).  Shahbazi has a master's degree in business from Columbia University and twenty-five years of experience in real estate development.

a.  The amended agreements.  On March 6, 2006, the plaintiff and the defendants, GS Company and Shiraz Company, entered into the limited liability company agreements (2006 agreements), pursuant to which the plaintiff acquired an equity interest in the companies.  Subsequently, the parties set out to restructure their relationship from equity to debt.  The defendants agreed to pay the plaintiff's interest as a monthly

---

[3] The plaintiff's president, Kenneth Witkin, described a specialty finance company as one involved in project-based, noncommercial banking.

obligation.[4]  To that end, the parties set about to negotiate and execute amended agreements.[5]  The process leading up to their execution took several months, Shahbazi first submitting term sheets to the plaintiff on November 30, 2007.  The parties were assisted in their negotiations by their respective counsel, who were experienced in complex real estate transactions and who drafted the amended agreements.

As described by the judge, "[t]he [a]mended [a]greements are detailed, comprehensive documents that address all major issues that arose in connection with the real estate partnership between the plaintiff and the KS defendants."  Relevant here, the amended agreements contain provisions requiring the

---

[4] By way of background, according to Witkin, the gist of the restructuring that Shahbazi proposed was "changing our agreement so we are no longer his partner and he would be responsible going forward for all leasing and all tenant improvements and we would simply just be in the equivalent of a mezzanine loan," which he defined as "a loan that is subordinate to a senior loan."  The attorney negotiating the restructuring on the defendants' behalf, Sally Michael, confirmed that under the restructuring, the plaintiff's investment was becoming effectively a mezzanine loan.

[5] On April 1, 2008, KS Shiraz Manager, LLC, and KS Shiraz Equity Partners, LLC, signed and delivered the "Amended and Restated Limited Liability Company Agreement of KS-CBRE Shiraz, LLC" (the amended Shiraz agreement).  Also on April 1, 2008, KS GS Manager, LLC, and KS GS Equity Partners, LLC, signed the "Amended and Restated Limited Liability Company Agreement of KS-CBRE GS, LLC" (the amended GS Agreement), and the "First Amendment," which were delivered on April 11, 2008.  The amended Shiraz agreement, the GS agreement, and the first amendment are referred to collectively as the amended agreements.

defendants to make monthly distribution payments to the plaintiff. In addition, both the amended GS agreement and the amended Shiraz agreement contain an integration clause, which provides as follows:

> "Entireties; Amendments. This Agreement and its exhibits constitute the entire Agreement between the Members relative to the formation of the Company. Except as otherwise provided herein, no amendments to this Agreement shall be binding upon any member unless set forth in a document duly executed by such Member."

The amended agreements also both contain a detailed provision affording the defendants a one-time right to refinance their primary loan, referred to as the PNC loan, upon satisfaction of enumerated conditions. A governing law provision provided that Delaware law would apply in construing the amended agreements and the obligations of the parties.[6] The first amendment set forth the addition of two properties in Marlborough to the assets of GS Company.

b. Execution of the amended agreements. From the record we add the following. It is undisputed that on March 12, 2008, the plaintiff signed and delivered the amended GS agreement and the amended Shiraz agreement to the defendants' attorney, Sally Michael. According to an April 2, 2008, e-mail from Michael, the defendants signed the amended agreements, which she dated

---

[6] The amended agreements also included a subordination clause, which we set out and discuss, infra.

"as of April 1, 2008." On April 2, 2008, Michael sent the signed signature pages to the plaintiff, but stated by accompanying e-mail that none of the agreements would go into effect unless she received three signed documents from the plaintiff concerning the property acquisitions and a loan that the defendants were pursuing with General Electric Capital Corporation (the GE loan). The documents requested were (1) the signed first amendment; (2) a signed consent vote authorizing the GE loan; and (3) a signed Patriot Act Certificate in connection with the GE loan. It is undisputed that the plaintiff supplied the requested documents. On April 11, 2008, according to an accompanying letter, Michael delivered to the plaintiff the "fully executed original" of the signature pages for the amended agreements, without stating any further express conditions.

According to the defendants, at some point after signing and delivering the amended agreements to the plaintiff, they learned that the GE loan had been terminated. The plaintiff did not receive the payments allegedly due under the amended agreements, and subsequently filed this action in Superior Court. The plaintiff's motion for summary judgment followed.

c. Evidence of the parties' negotiations. In opposing the summary judgment motion, the defendants argued that evidence of the parties' negotiations raised an issue of fact whether the

plaintiff understood and agreed that the amended agreements were subject to two conditions:  first, that the defendants obtain the GE loan, and second, that the defendants acquire two properties in Marlborough.  Although those transactions are not identified as conditions precedent in the amended agreements, the defendants maintain that they were integral to the amended agreements' effectiveness.  They rely on evidence of the parties' e-mail correspondence in late March and early April, 2008, to establish the parties' understanding of the inclusion of the two conditions in the deal.

In particular, the defendants point to several e-mails between Shahbazi and Paul Martin, Shahbazi's primary contact at RFC, in which Shahbazi linked the Marlborough property acquisitions to his ability to refinance the PNC loan through GE, and thereby fund the restructure.  The judge took note of the following exchange in his memorandum.  On April 7, 2008, Martin e-mailed Shahbazi regarding delivery of the executed amended agreements and the status of the GE loan, stating "why you won't sign at least Shiraz unconditionally is beyond comprehension."[7]  Shahbazi responded that the property

---

[7] For context, we add that, according to the plaintiff, Shahbazi was seeking to acquire the Marlborough properties for the GS Company's portfolio, and not for the Shiraz Company's portfolio.  Hence, the reference in Martin's e-mail is presumably to the amended Shiraz agreement.

acquisitions were necessary to obtain the GE loan, and that the GE loan "is where I get my comfort that I would have the funds necessary to service your approx[imately] $27mm preferred equity in GS/Shiraz."

The judge ruled that, under either Delaware or Massachusetts law, the amended agreements were fully integrated and that the parol evidence rule barred admission of the parties' e-mail correspondence to vary the amended agreements' terms. The plaintiff's motion for summary judgment motion was allowed, a final judgment entered awarding damages to the plaintiff, and the defendants filed this appeal.

2. Choice of law. As noted, the amended agreements provided in their governing law provisions that Delaware law be applied to "construe and enforce the 2008 agreements." Accordingly, the plaintiff argues that Delaware law should apply to the controversy here. The defendants counter that the amended agreements never took effect, hence the contract's choice of law provision is without effect, and Massachusetts law should apply. Both parties assert their respective positions in perfunctory fashion, without supporting argument or authority, and both maintain that they should prevail under the laws of either jurisdiction in any event.

Massachusetts will give effect to a choice of law provision in a contract dispute, if to do so is fair and reasonable. See

Morris v. Watsco, Inc., 385 Mass. 672, 674 (1982); Stagecoach Transp., Inc. v. Shuttle, Inc., 50 Mass. App. Ct. 812, 817-818 (2001). Our courts make an exception in situations where the validity of the contract's formation is challenged, as with a claim of precontract misrepresentation or fraud in the inducement, in which case it is less likely that the contract's choice of law provision will be honored. See, e.g., Jacobson v. Mailboxes Etc. U.S.A., Inc., 419 Mass. 572, 578 (1995); Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d 607, 610-611 (1st Cir. 1993).

Whether that principle applies here is a question we need not decide, as we agree that the choice of law does not affect the outcome. Both jurisdictions approach the issue of integration by considering the nature of the writing, and in particular, whether the parties included an integration clause. As Massachusetts cases on the topic admit to more complexity, and in the interest of fairness and finality, we focus our discussion there.[8]

---

[8] Under Delaware law, an integration clause gives rise to a rebuttable presumption that the writing contains the parties' complete agreement. Webber v. Anderson Homes LLC, 908 A.2d 616, 620 (Del. Super. Ct. 2006). "[T]his presumption can be overcome by a showing of fraud, bad faith, unconscionablity, negligent omission or mistake in fact." Ibid., quoting from Kronenberg v. Katz, 872 A.2d 568, 592 (Del. Ch. 2004). Indeed, absent unconscionable or other extraordinary circumstances, "the existence of such a clause in a formal written contract between sophisticated parties" is conclusive evidence that the contract

3. <u>Integration</u>. This court recently observed that an integration clause is evidence of integration, but is not dispositive. <u>Chambers</u> v. <u>Gold Medal Bakery, Inc</u>., 83 Mass. App. Ct. 234, 243 (2013). Generally, contracting parties are understood to have included an integration clause in their written agreement with the intent "to preclude the subsequent introduction of evidence of preliminary negotiations or side agreements." <u>Id</u>. at 244, quoting from <u>Security Watch, Inc</u>. v. <u>Sentinel Sys., Inc</u>., 176 F.3d 369, 372 (6th Cir. 1999). However, the nature of the writing or the situation of the parties may warrant consideration of the parties' negotiations in order to determine whether they intended that the written agreement, even one containing an integration clause, be fully integrated. See <u>Wang Labs., Inc</u>. v. <u>Docktor Pet Centers, Inc</u>.,

---

is the parties' complete agreement. <u>J.A. Moore Constr. Co</u>. v. <u>Sussex Assocs. Ltd. Partnership</u>, 688 F. Supp. 982, 987 (D. Del. 1988). On the undisputed facts, the defendants have not made the requisite showing.

Nevertheless, the defendants argue that evidence of the parties' negotiations was admissible to prove that the integration clause, along with the rest of the agreement, was not intended to take effect unless the conditions precedent were met. However, in <u>Aetna Ins. Co</u>. v. <u>Newton</u>, 274 F. Supp. 566, 572 (D. Del. 1967), the court ruled that where the parties' written contract contained an integration clause, the parol evidence rule was a bar to the parties' alleged oral agreement that a condition precedent was to be fulfilled before the contract was to take effect. Here, under Delaware law, the defendants' assertion of an oral condition precedent is not sufficient to overcome the presumption in favor of the integration clause in the parties' written agreement.

12 Mass. App. Ct. 213, 219 (1981). Whether an agreement is fully integrated turns on the intention of the parties and "is an issue of fact for the decision of the trial judge, entirely preliminary to any application of the parol evidence rule." Green v. Harvard Vanguard Med. Assocs., Inc., 79 Mass. App. Ct. 1, 9 (2011), quoting from Wang Labs., Inc. v. Docktor Pet Centers, Inc., supra.

The defendants argue that the prior negotiations of the parties in this case are admissible to establish that the amended agreements were not intended to be fully integrated. But where, as here, sophisticated business people, represented by counsel, have negotiated and executed a complex written document touching on all significant aspects of their transaction, and have included an integration clause, we need not resort to their prior negotiations concerning the transaction at hand "to divine the intention of the parties on the question of integration." USTrust v. Henley & Warren Mgmt., Inc., 40 Mass. App. Ct. 337, 341 (1996). More than four months of negotiations followed from the time Shahbazi proposed the restructuring to the plaintiff until he executed and delivered the amended agreements. Had there been an omission of a refinancing contingency, "it was the responsibility of the borrower, which has not disclaimed having had the advice of

competent counsel, to read the documents and remedy the omission before signing off on the papers." Id. at 342.

Moreover, the amended agreements specifically addressed the issue of refinancing the PNC loan and delineated the terms and conditions for that refinancing. The fact that the amended agreements expressly included a one-time right to refinance the PNC loan cuts against the notion, suggested by the defendants, that the parties simply "didn't bother to craft such language," to include the GE loan contingency, because it was understood as integral to the deal. See, e.g., Bendetson v. Coolidge, 7 Mass. App. Ct. 798, 802 (1979) (comparing detailed contract that addressed specific issue raised by parties' dispute with contracts that "failed to speak one way or the other to an essential question raised by the subject matter of the agreement"). Compare Wang Labs., Inc. v. Docktor Pet Centers, Inc., 12 Mass. App. Ct. at 219-220 (failure of lease to address equipment's performance supported judge's finding of collateral agreement). "Where the writing shows on its face that it is the entire agreement of the parties and 'comprises all that is necessary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending it to be a complete and final statement of the whole transaction.'" Bendetson v.

Coolidge, supra at 802-803, quoting from Glackin v. Bennett, 226 Mass. 316, 319-332 (1917).[9]

We contrast cases dealing with agreements where the form of the writing is brief or boilerplate, or where the parties are mismatched. It is true that in such instances, "proof could be received ranging beyond the writing proper" to determine whether the parties intended full integration. Antonellis v. Northgate Constr. Corp., 362 Mass. 847, 849 (1973). For example, in Wang Labs., Inc. v. Docktor Pet Centers, Inc., 12 Mass. App. Ct. at 218, no integration was found where a lease agreement, though containing an integration provision in fine print, consisted of a standardized printed form. See Antonellis v. Northgate Constr. Corp., supra at 849-850 (no integration intended in parties' one-page agreement and "evident design to mesh" with contingency); Ryder v. Williams, 29 Mass. App. Ct. 146, 150 (1990) (promissory notes in unusual form found not integrated). Also distinguishable are agreements involving parties of dissimilar bargaining power or sophistication in the matter at hand. See Tilo Roofing Co. v. Pellerin, 331 Mass. 743, 745-746

---

[9] The defendants also point to the first amendment, which addresses the addition of the Marlborough properties to the GS portfolio, as evidence that the acquisitions were intended as a condition precedent to the deal. The language of the first amendment does not support that view, and further provides that the company is governed pursuant to the April 1, 2008, amended agreement and that "all other terms and conditions of the [amended] Agreement shall remain in full force and effect."

(1954) (contract pressed on homeowner by "insistent" salesman found to be subject to condition precedent); <u>Green</u> v. <u>Harvard Vanguard Med. Assocs., Inc</u>., 79 Mass. App. Ct. at 9-11 (employee claimed he signed release of his discrimination claim against employer in exchange for oral promise of another job).[10]  Those cases, in which prior negotiations were considered to determine the parameters of the parties' agreement, do not bear on the very different circumstances here.

The defendants counter that, despite the presence of an integration clause and the absence of express conditions, it was understood that the amended agreements, upon delivery, were to be held in escrow pending completion of the GE loan and property acquisitions, and that the amended agreements, including the integration clause itself, never became operative when those transactions failed to occur.  Even were we to consider the e-mail exchanges and construe them in the defendants' favor, the

---

[10] Another situation in which we may look beyond the writing is where the agreement is ambiguous on the issue of integration, even in the presence of an integration clause.  See, e.g., <u>Holmes Realty Trust</u> v. <u>Granite City Storage Co</u>., 25 Mass. App. Ct. 272, 275-276 (1988) (despite integration clause, ambiguity found in meaning of lease agreement where parties simultaneously executed a second agreement dealing with improvements to leased premises); <u>Kobayashi</u> v. <u>Orion Ventures, Inc</u>., 42 Mass. App. Ct. 492, 496 (1997).  Though the defendants' brief makes a passing reference to the principle that an ambiguous contract raises an issue of fact, they asserted at oral argument that they were not claiming that the integration clause gave rise to an ambiguity, but rather that the integration clause did not take effect until the conditions precedent were satisfied.

evidence does not show that this understanding was shared by both parties as a condition to the amended agreements' effectiveness. Rather, the e-mails indicate that the plaintiff was aware that Shahbazi was attempting to obtain the GE loan and acquire the Marlborough properties, and cooperated in that effort, but "that anticipation was never made a part of the agreement reflecting the contract between them." Winchester Gables, Inc. v. Host Marriott Corp., 70 Mass. App. Ct. 585, 593 (2007).

While the defendants may have intended that the executed amended agreements not take effect upon delivery, it is well-established that "[t]he unexpressed intent of one party cannot control the legal effect" of the parties' written agreement and explicit integration clause. Winchester Gables, Inc. v. Host Marriott Corp., supra, quoting from Quirk v. Smith, 268 Mass. 536, 543 (1920). Whatever the defendants may have hoped, the communications fail to raise a question of fact as to whether the plaintiff understood and agreed to hold the fully executed amended agreements in escrow once they were delivered, without express conditions, on April 11, 2008.

Based on the foregoing, the defendants' conclusory assertion that it was understood that the amended agreements were not to take effect until the certain oral contingencies were met does not create an issue of fact concerning

integration.  The judge properly ruled that the amended agreements were fully integrated, and as such, properly declined to consider parol evidence to contradict their plain terms.  "A judge uses summary judgment for the purpose for which it was intended when, as in this case, a party seeks to alter what the agreement provides by saying, in effect, 'that was not what we meant at all.'"  USTrust v. Henley & Warren Mgmt., Inc., 40 Mass. App. Ct. at 343.

4.  Damages.  Following the entry of summary judgment, a second judge awarded the plaintiff damages in the amount due in accordance with the amended agreements.  The defendants maintain that pursuant to the amended agreements' subordination clause. no damages are owed.  The subordination clause appearing in the amended agreements provided as follows:

> "Subordination.  All payments due to the Members pursuant to this Agreement shall be fully subordinate to any payments due under any Approved Loan, but payments of the Required Distributions to the Preferred Member shall be permitted in the absence of the declaration of a continuing event of default by the subject Lender under the new first mortgage loan by the Lender thereunder, unless such payment would result in a required debt service payment not being made to the Lender when due as a result of insufficient net Operating Income.  Any payments due pursuant to this Agreement shall be paid only after periodic payments of the principal and interest and all other payments under all Approved Loans have been made as required pursuant to the terms thereof."

As defined in the amended agreements, the "preferred member" refers to the plaintiff, and the "required distribution"

refers to the mandatory monthly payments the defendants were to make to the plaintiff. We reject the defendants' argument that because they were in default of the PNC loan, the above language relieved them of the obligation to pay the plaintiff. Even assuming, without deciding, that "the new first mortgage loan" refers to the PNC loan,[11] "payments of required distributions to the preferred member" must be read in the context of the immediately preceding phrase, "all payments due to members pursuant to this agreement shall be fully subordinated." It is clear, from the subordination clause read as a whole, that it merely sets forth the priority of the defendants' obligations and does not excuse or extinguish them in the event of the defendants' default on the primary loan. There is no reasonable interpretation of the subordination clause that would relieve the defendants of their obligations to the plaintiff.

<u>Judgment affirmed</u>.

---

[11] As the plaintiff points out, the phrase "new first mortgage loan" is employed elsewhere in the amended agreements to refer to the defendants' one-time right to refinance the PNC loan and utilized similar subordination language in the event the defendants refinanced with a new lender.