JORDAN MARSH COMPANY & another[1] *vs.* BETH ISRAEL
HOSPITAL ASSOCIATION & another.[2]

Suffolk.    December 8, 1953. — March 3, 1954.

Present: QUA, C.J., LUMMUS, WILKINS, SPALDING, & COUNIHAN, JJ.

*Arbitration. Appraisal. Landlord and Tenant,* Rent, Arbitration.
*Building.*

Under a lease for more than fifty years of a parcel of city land with a
building thereon which, although structurally separate, was connected
through openings in the walls with adjoining buildings and was used
with them as a department store by the lessee, arbitrators appointed
to determine the rent for a certain ten year period of the term pur-
suant to provisions of the lease requiring them to fix it in such amount
"as in their opinion is a fair rental return on the interest of the . . .
[lessor] in the demised premises, taking into account . . . all [ma-
terial] circumstances then past, then existing and reasonably to be
foreseen," did not go outside the scope of the submission by treating
the demised building as "an integral part of" the whole store and not
as a single, separate, "free-standing" building, nor was the award
invalid because the arbitrators took into consideration the rental of
nearby property similarly used as part of another store and increases
in the cost of living.

BILL IN EQUITY, filed in the Superior Court on March 3,
1953.

The suit was heard by *Murray, J.,* on a demurrer to the bill.

*Joseph P. Healey, (Parker G. Montgomery* with him,) for
the plaintiffs.

*Robert W. Meserve, (James W. Scanlan & John R. Serafini*
with him,) for the defendants.

COUNIHAN, J.    This is a bill in equity whereby the
plaintiffs seek to vacate and to have declared null and
void an award of a majority of a board of arbitrators fixing
the amount of rent to be paid for the premises 23–25 Summer

[1] Alstores Realty Corporation, hereinafter referred to as Alstores.

[2] Trustees of Tufts College.

Street, Boston, for the ten year period beginning January 1, 1953. The amount of rent to be fixed for these premises for the period mentioned was submitted to three arbitrators pursuant to the terms of and upon the conditions set forth in a certain lease of these premises which were owned by the defendants and occupied by Jordan Marsh Company, hereinafter called Jordan, as lessee.

The defendants filed the following joint demurrer to the bill. "The defendants demur to the bill of complaint for the reasons that: 1. The bill does not state a cause of action or set forth or show any right or ground for relief in equity against the defendants. 2. The facts alleged in the bill are not sufficient to establish any jurisdiction in equity to set aside an appraisal performed in accordance with the terms of the lease, as is admitted in the . . . bill." The suit comes here upon the plaintiffs' appeals from an interlocutory decree sustaining the demurrer and a final decree dismissing the bill. There was no error.

The facts which are admitted by the demurrer may be summarized as follows: About June 11, 1930, Jordan entered into a lease with the then owners of these premises. The lot of land comprising the premises has a frontage on Summer Street of approximately 29 feet 6 inches, and a depth of about 90 feet, with an area of about 2,660 square feet. Jordan assigned this lease to Alstores which subsequently reassigned it to Jordan. The defendants about December 29, 1945, acquired title to the demised premises as tenants in common. The term of the lease was for fifty-two years and seven months, beginning June 1, 1930, and ending December 31, 1982. At the time the lease was entered into there was a six story building about fifty years old on the land, which structurally was a separate building from adjoining buildings although it was connected through openings in its walls with other buildings owned by Jordan and used by it in the conduct of its department store business. The lease contemplated that Jordan at its election could demolish and remove this building and build and construct upon the leased premises and other adjoining

premises owned by it a new and modern building. In 1950 and 1951 Jordan removed the old building and constructed upon the leased premises and its adjoining premises such a new building.

The lease provided for an annual rental for the first two years and seven months of $22,850.52, and for the next twenty years ending December 31, 1952, an annual rental of $32,500. Thereafter for the next ten years beginning January 1, 1953, the rent is to be $32,500 yearly, or such greater sum as may be agreed upon or determined by arbitration. The rent for the two successive ten year periods is to be determined similarly but in no event is any rent to be determined or fixed for any ten year period at a rate less than the annual rate in effect at the end of the last preceding period.

The lease contained these material provisions with respect to arbitration: The yearly rental for the ten year period beginning January 1, 1953, "shall in no event be less than . . . $32,500 . . . and shall . . . be such greater sum, if any, as shall be determined by arbitration of three (3) disinterested persons, one to be appointed in writing by the Lessors, one to be appointed in writing by the Lessee, and the third to be appointed in writing by the two (2) persons so appointed. . . . [T]he sum determined and reported in writing to the parties by the three arbitrators or a majority of them, after reasonable notice to and opportunity for both parties to be heard, *shall be conclusive, final and binding upon both parties* . . . [emphasis supplied]. All arbitrators appointed hereunder . . . shall determine such rental *as in their opinion* [emphasis supplied] is a fair rental return on the interest of the Lessors in the demised premises, taking into account, so far as presented to them and material, all circumstances then past, then existing and reasonably to be foreseen, and taking into account the circumstances, if such shall be the case, that the building then existing on the demised premises may have been constructed wholly or in part at the expense of the Lessee and may be greater in value than the building now standing on the demised

premises, and may give such weight as they may deem fair to such circumstances if so existing, to the end that the Lessee shall not be required to pay rental on excess value contributed by it . . . . It is the intent of the above provisions relative to the erection at the expense of the Lessee of a new and more valuable building that the arbitrators shall determine the fair annual rental as though the building now existing were still on the premises (allowance being made for reasonable use and wear thereof) but the arbitrators shall not fix a rental lower than this because of any gain which will in their opinion come to the Lessors at the expiration of the lease through having the premises returned to them with a more valuable building thereon."

No agreement having been made by the parties with respect to the rent for this period, William K. Bean was duly appointed an arbitrator by the plaintiffs, Arthur J. Dolben was duly appointed an arbitrator by the defendants, and Philip H. Theopold was duly appointed the third arbitrator by the two first appointed.

A hearing was had. Bean and Dolben each prepared detailed appraisals of the property and its rental value which were presented to the arbitrators and considered by them. No other evidence was offered. Counsel for the parties appeared, argued, and filed briefs. Subsequently, Dolben and Theopold, a majority of the arbitrators, filed a report in which they fixed the rent for the ten year period beginning January 1, 1953, at $35,000 per year.

The report of the majority is as follows: "The principal point at issue in determining the rental to be paid for the next ten years for the premises in question seems to hinge on the interpretation placed upon the charge to the arbitrators contained in the lease, which reads as follows: 'The arbitrators shall determine such rental as in their opinion is a fair rental return on the interest of the lessors in the demised premises . . . .'

"We must interpret this to mean the demised premises as they existed at the commencement of the lease and as they exist today, namely, an integral part of a larger whole. We

are not allowed to give any weight in either direction to the fact that a new building has been constructed on the site, but must consider the problem as if the old buildings were still in existence. However, we learn nothing from the lease that indicates that we must consider the use of this building under any other circumstances than those which existed in 1932 [1930?].

"It is our understanding that at that time walls had been removed, or cut through, and not only were important departments housed herein, but they overlapped into other properties used in conjunction with this one. Likewise, this building appears to have shared with its neighbor a very important entrance to the entire property of Jordan Marsh. Therefore, we find difficulty in attempting to place a rental figure on this building, as if [it] were free-standing, occupied by a single tenant whose business activities were confined in this one property. Such, as a matter of fact, is not the case today, was not the case twenty years ago, and presumably is not to be the case for the next thirty years. We here point out that the arbitrators are charged to take into account 'so far as presented to them and material all circumstances then past, then existing, and reasonably to be foreseen. . . .' This is a long-term lease made with the Jordan Marsh Company in the light of what has been above stated. There seems no way of escaping from the conclusion that this problem cannot be considered in any other light. The fact that the now to be determined rental shall, in the future, become the minimum rent is not a point to influence the arbitrators; that it may, or may not, result in a hardship to the lessee at a later date is not a matter for the arbitrators to consider. The lease contains the clause and no expression of opinion by the arbitrators can change it.

"We have given consideration to various other leases, rental rates, locations, types of occupancies, and terms of leases but when all is said and done, we have very little to use as an exact equivalent for measurement and guidance. We agree that this property is in one of the most strategetically located retail areas of the city, but we find it

difficult to reach a mathematical conclusion, based on other similar properties. Instances can be cited where retail business is being conducted in this city in small buildings, isolated from their neighbors, in surprising volume; yet again, other examples can be shown which tend to prove that such a small piece cannot support an adequate rental.

"It has been said that the new rental of $32,500 net, for 23–25 Summer Street, agreed to in 1930, was only arrived at under great duress. While this is doubtless true in the view of the lessee, it is at least conceivable that the lessor entered these negotiations in the fear of losing his tenant and made concessions beyond his then desire. Whatever were the circumstances at the time, it is a matter of history now and is not reflected in any word of instruction to your arbitrators contained within the lease. To us there seems no proper way of reaching this determination, save to accept the document as it stands and assume, that at the time, the price agreed upon was the best price for both parties without regard to subsequent events which were then unpredictable.

"In our search for comparisons we found only one example which can be called truly comparable. We call to your attention the property at 22–24 Summer Street, immediately across the street. The rental on this property from 1921 to 1946 was $25,000. The rental on 23–25 Summer St. from 1923 to 1932 was $22,880.55. Both of these were net figures.

"Twenty-two to twenty-four Summer Street is an integral part of the Filene's store. It contains an important entrance to that store; it is used in conjunction with the other properties which make up the store; and there appears to be no evidence of where the one ends and where the other begins. These circumstances seem as identical as any we can find with those existing for the subject property.

"The lease covering 22–24 Summer Street called for an appraisal to establish rental for the ten year period 1946–1956. The rent was increased for the ten year period 1946–1956 to $37,134 per annum, as opposed to $25,000 that had

been paid since 1921. It is interesting to note that, in this case, instructions to the appraisers stated that they should give consideration only to the ground and not to the building. To our minds, this couches in somewhat different words the same charge by which your arbitrators are bound. The rental increase in this case was approximately fifty per cent.

"It has been submitted that the cost of living has risen in the year 1952 to an index of 189, based on a 1935–1939 average of 100. However, if we take the average of this same Federal Reserve Board figures for the years 1940–1951, this average index is 141.6. The 1932 figure is reported to be 97.6. The increase from that figure to the average for the past twelve years is approximately forty-five per cent. In 1933, the total rent and taxes paid by Jordan Marsh was $41,749.60. A forty-five per cent increase from this figure would result in a rental, including taxes, of $60,536.92. Adjusting 1952 taxes to the old building, we arrive at a figure of $22,712 which deducted from $60,536.92 leaves a figure of $37,824.92 as an indicated net rental figure which would be comparable with the increase in living costs from 1932 to the average of the past twelve years.

"Giving consideration to all points presented to us and to the facts mentioned herein, and endeavoring to look into the future, we conclude that the rental for the years 1953 through 1962 should be $35,000."

Bean filed a minority report as follows: "I am compelled to dissent from the majority report made by the other two arbitrators in this case. I do not agree that when the lease requires the arbitrators to determine 'a fair rental return on the interest of the lessors in the demised premises' this means that the lessors' interest must be valued as 'an integral part of a larger whole,' as the majority report states. If such were the correct interpretation of the lease provision, it would involve the assumption that there will always be a tenant financially as strong as Jordan which not only desires but is virtually obliged to occupy the demised premises as a part of a larger whole. Yet the lease requires that the valuation shall be on the assumption that the old build-

ing is still on the premises. In my opinion the correct interpretation of the direction to the arbitrators in the lease is that the rental value of that particular lot of land, with the old building on it, is to be determined by the usual methods of real estate appraisal applicable to any separate and distinct piece of property. It is the interest of the lessor in the demised premises, not in an undivided part of a larger whole, which is to be valued. Of course, the possibility that there might continue to be a market for it for use in conjunction with other adjoining property is to be taken into account along with other possibilities as to its highest and best use, but only as a possibility and not as a conclusive assumption of fact.

"Furthermore, with respect to the comparison drawn by the majority report with the property at 22–24 Summer Street, the fact seems to have been overlooked that that property contains 4,488 square feet of lot area, as against 2,660 square feet in the subject parcel. Furthermore it is a corner parcel, with a frontage on Summer Street at least equal to the subject property, and a long frontage on Hawley Street. The rent fixed for that property in 1946, $37,134 per annum, figures out to $8.27 per square foot of land area. That side of Summer Street in my opinion is more valuable than the Jordan side. The same rental per square foot of land area applied to the subject property would produce a net rental figure of $21,998.20 per annum. In my opinion the fair annual net rental value of the subject property is not over $22,000 per annum."

Both parties apparently agree that whether the proceedings upon which this bill is based are considered as an arbitration or as an appraisal the same principles of law apply. It is likewise agreed that if the award of the majority of the arbitrators went beyond the scope of the submission, as matter of law, this court may review their action. No suggestion of fraud, dishonesty, corruption, or bad faith on the part of any of the arbitrators has been made.

There appear to be only two questions of law before us: 1. Did the majority of the arbitrators err by going beyond

the scope of the submission?  2.  Did they err in giving consideration to comparable values and increases in costs of living in arriving at their conclusions?

The plaintiffs contend that the majority of the arbitrators did not follow the express terms of the submission because they failed to determine the fair rental value of the leased premises "as though the building now existing were still on the premises."  They assert that the majority of the arbitrators were in error as matter of law because they fixed the fair rental of the premises by considering the new building as well as the old building as an integral part of the larger Jordan building.  They also complain that the majority of the arbitrators based their award, in part at least, upon the rent of comparable premises occupied by Filene across the street, and that it was based in part at least upon an increase since 1930 in the Federal Reserve Board average cost of living index.

On the other hand, the defendants contend that the plaintiffs seek to have the court substitute its judgment for that of the majority of the arbitrators which they assert cannot be done under principles of law applicable to these proceedings.

It is significant that the record discloses that the arbitrators received and considered detailed appraisals of the property and of its rental value, one prepared by the arbitrator appointed by the plaintiffs and one prepared by the arbitrator appointed by the defendants.  The contents of these appraisals do not appear in the record and these appraisals are not before us.

We are of opinion that this case is controlled by what was said in *Eliot* v. *Coulter*, 322 Mass. 86, at page 89: "The main question concerns the nature and effect of the provision for arbitration by three disinterested persons.  In one of the leases those persons were called arbitrators, while in the others they were spoken of merely as disinterested parties or persons.  They were not arbitrators in the technical sense, for there was no existing claim to be arbitrated.  There was only a valuation to be made that would in the future prevent a resort to the courts or to technical arbitration.

The leading case in this Commonwealth is *Palmer* v. *Clark*, 106 Mass. 373. In that case, at page 389, Colt, J., said, 'A reference to a third person . . . to make an appraisement of property and the like . . . differs in many respects from an ordinary submission to arbitration. . . . The decision may be made without notice to or hearing of the parties, unless such notice and hearing be required by express provision . . . and it may be made upon such principles as the person agreed on may see fit honestly to adopt, or upon such evidence as he may choose to receive.' " And at pages 90–91, "We think that in the present cases the leases called for a mere appraisal, and not an arbitration . . . and that the correctness of the principles and methods of valuation adopted .by the appraisers cannot be inquired into by the courts, in the absence of fraud, corruption, dishonesty or bad faith, the existence of which the plaintiffs do not assert." See Bacon, Commercial Arbitrations, 4.

We agree, however, that an award may be invalid if it was outside the scope of the submission, but "It is familiar law that an award made within the scope of the submission is not made invalid by a mistake of the arbitrator as to law or fact. . . . Even if he was mistaken in his interpretation of the legal effect of the contract, the award does not thereby become invalid. The parties received what they agreed to take, the honest judgment of the arbitrator as to a matter referred to him." *Phaneuf* v. *Corey*, 190 Mass. 237, 246–247.

The submission here required the arbitrators to "determine such rental *as in their opinion* [emphasis supplied] is a fair rental return on the interest of the Lessors in the demised premises, taking into account, so far as presented to them and material, all circumstances then past, then existing and reasonably to be foreseen . . . . It is the intent of the above provisions . . . that the arbitrators shall determine the fair annual rental as though the building now existing were still on the premises . . . ."

We do not believe that the majority of the arbitrators went outside the scope of the submission when they said,

"We must interpret this [the interest of the lessors in the demised premises] to mean the demised premises as they existed at the commencement of the lease and as they exist today, namely, an integral part of a larger whole." They reported further that "It is our understanding that at that time [the commencement of the term] walls [of the old building] had been removed, or cut through, and not only were important departments housed herein, but they overlapped into other properties used in conjunction with this one. Likewise, this building appears to have shared with its neighbor a very important entrance to the entire property of Jordan Marsh. Therefore, we find difficulty in attempting to place a rental figure on this building, *as if [it] were free-standing, occupied by a single tenant whose business activities were confined in this one property* [emphasis supplied]. Such, as a matter of fact, is not the case today, was not the case twenty years ago, and presumably is not to be the case for the next thirty years." The arbitrators were charged to take into account, "so far as presented to them and material, all circumstances then past, then existing and reasonably to be foreseen."

The plaintiffs admit in their bill that "structurally it [the old building] was a separate building from the others in said block, though connected with them by various openings." We think that by these connections it had become an integral part of other buildings occupied by Jordan at that time, and that it then could not have been valued as a single, separate building, "free-standing." It may be worth while to note too that Bean in his minority report said, "Of course, the possibility that there might continue to be a market for it for use in conjunction with other adjoining property is to be taken into account along with other possibilities as to its highest and best use, but only as a possibility and not as a conclusive assumption of fact."

There is no merit in the contentions of the plaintiffs relative to the consideration by the majority of the arbitrators of comparable rent of part of the Filene building across the street or of increases in the cost of living as shown by the

Federal Reserve Board index. Obviously the determination of rent was not based solely on these figures for, if it were, the rent fixed would have been much higher. These figures were only factors taken into consideration by them together with other factors, some of which may have appeared in the appraisals submitted to them and some of which may have been based upon their own experience and judgment.

Because of what we have said we need not consider other claims of the plaintiffs.

It follows therefore that the interlocutory decree is affirmed and the final decree is affirmed with costs of this appeal to the defendants.

*So ordered.*