SUPERIOR COURT 
 
 HECTOR MAZA, MONJID HAMDAN, AND CORTNEY MITTELSTEADT v. GINER, INC. AND ANDREW BELT

 
 Docket:
 2184CV01915-BLS2
 
 
 Dates:
 June 2, 2025
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ALLOWING DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT
 
 

 Giner, Inc., is a Boston-based research and development firm that works in the electrochemical technology industry. Giner sold one of its subsidiaries in 2020.[1] As part of this transaction, Cortney Mittelsteadt, Hector Maza, and Monjid Hamdan ended their employment with Giner and became employees of Plug Power, Inc., which required these Plaintiffs to sell their shares in Giner. Andrew Belt remained with Giner and became its CEO.
The Plaintiffs entered into Stock Redemption Agreements that established the terms under which Giner would repurchase their shares. The Purchase Price consisted of specified percentages of: (I) the proceeds Giner was to receive from selling Giner ELX to Plug Power; (ii) the Adjusted Valuation of Giner’s remaining assets other than its interest in a company called 1A Smart Start LLC, as determined by a binding appraisal conducted by a third-party valuation advisor; and (iii) any future proceeds that Giner may receive from selling its equity interests in Smart Start.
Plaintiffs claim that Giner and Belt improperly interfered with the third-party valuation of Giner’s assets—and that Giner thereby breached the Agreements, Giner and Belt breach their fiduciary duties, and Belt committed tortious interference with contractual relations (the “Valuation Claims”). They also claim that Giner committed a further breach of contract by not paying the Plaintiffs shares of a later distribution by Smart Start (the “Smart Start Claim”).
The Court will allow Defendants’ motion for summary judgment in their favor on all claims. The Valuation Claims fail because the parties agreed that the independent appraisal of value would be final, Plaintiffs have not mustered
 
--------------------------------------------
 
[1] Plaintiffs are bound by the allegation in their amended complaint that Giner sold all of its shares in its subsidiary Giner ELX to Plug. See G.L. c. 231, § 87; Adiletto v. Brockton Cut Sole Corp., 322 Mass. 110, 112 (1947).
 
                                                            -1-
 
any evidence that Griner breached its contractual obligations under the Agreements, and neither Griner nor Belt owed the Plaintiffs any fiduciary duties. The Smart Start Claim fails because the summary judgment record establishes that the challenged distribution from Smart Start did not arise from any sale of Giner’s Smart Start equity interests.
1. Factual Background. When they exercised their Stock Redemption Agreements, Mittelsteadt owned 8.48 percent of Giner, Maza owned
4.09 percent, and Hamdan owned 1.92 percent. At that time Mittlesteadt was Giner’s CEO, Maza worked in business development, and Hamdan was an engineer with expertise in the technology that Plug Power was acquiring from Giner. Belt was a director and the President of Giner, and succeeded Mittlesteadt as CEO.
1.1. The Stock Purchase Agreements. Plaintiffs and Giner agreed that Giner would repurchase each Plaintiff’s company stock, and that the purchase price would have three components.
First, each Plaintiff would receive a proportionate share of the cash proceeds Giner was to receive from Plug, based on their percentage ownership of Giner.
Second, each Plaintiff would also receive a similar proportionate share of the value of the businesses and assets to be retained by Giner, excluding Giner’s ownership interests in Smart Start. The Plaintiffs agreed that this value would be determined by Orchard Partners, Inc., which had conducted four prior valuations of Giner in accord with § 409A of the Internal Revenue Code while Mittlesteadt was CEO. The contract instructed Orchard Partners to reduce or “discount” the valuation by thirty percent to account “for lack of marketability, or control,” and to “exclude the value of Smart Start equity held by Giner.”
The Agreements were silent as to what information Orchard Partners should obtain and rely upon to value Giner, and placed no restrictions on the Plaintiffs’ or Giner’s ability to communicate with and provide information to Orchard Partners as it was conducting this valuation.
Each Plaintiff and Giner agreed in these contracts that the 409A valuation “will be binding on both parties” and that “neither will challenge the valuation or the preparation thereof.”
Third, the Agreements also provided that each Plaintiff would receive the same percentage share “of any proceeds from any sale by Giner of [the] Smart Start
 
                                                            -2-
 
equity” owned by Giner that was undertaken “in accordance with” a 2018 Asset Purchase Agreement between Giner and Smart Start.
The Agreements state that these three aspects of the total Purchase Price constitute “the full consideration for the purchase of the Shares and no other amounts will be due or owing by Giner with respect to the purchase and sale thereof.”
1.2. The Independent Valuation. Giner promptly hired Joel Johnson of Orchard Partners to perform the appraisal. Johnson was very familiar with Giner, its assets, and its lines of business, because he had conducted the four prior 409A appraisals of Giner.
The letter of engagement for this appraisal provides that Giner “will be responsible for providing the information requested by Orchard,” and that Johnson was “obligated to provide an objective opinion regardless of the preferences of the management, directors and shareholders of the Company.”
Johnson followed the same basic process he had used during the prior valuations that he conducted when Mittlesteadt was Giner’s CEO. He requested and obtained information from Giner’s CFO, provided four working drafts of his appraisal to Giner, each time received and considered comments and additional information from Giner, and eventually presented his final valuation opinion.
In his first draft, Johnson mistakenly included the value of Giner’s Smart Start stock and failed to apply the contractually required 30 percent discount for lack of marketability; after those errors were corrected Johnson’s first draft valued Giner’s remaining assets at $15.296 million. Giner believed that was high, and presented additional or revised information. In his final valuation, Johnson ultimately determined that the value of Giner’s remaining assets (excluding the Smart Start equity, and after applying the agreed-upon 30 percent discount) was $7.739 million.
Several weeks after Johnson provided his final valuation, Plaintiffs informed Giner that they disagreed with and intended to challenge Johnson’s ultimate conclusion.
1.3. Giner’s Smart Start Revenues. In June 2021, Smart Start distributed about $8.1 million to Giner. This was not the result of any sale by Giner of its Smart Start equity. Instead, Smart Start informed Giner that it had been able to recapitalize by borrowing money from some banks and was using part of its
 
                                                            -3-
 
new financing to pay a cash distribution to its shareholders. Giner did not pay any part of this distribution to the Plaintiffs.
In December 2021, Smart Start was sold to a new owner. As part of this transaction, Giner received just over $4.6 million for selling all of its Smart Start equity. Giner paid each Plaintiff their proportionate share of these proceeds, in accord with their Stock Repurchase Agreements.
2. The Valuation Claims. Giner and Belt are entitled to summary judgment on all four claims that concern the independent valuation of Giner.
2.1. Plaintiffs May Not Challenge the Appraisal. Most of Plaintiffs arguments are thinly-veiled and impermissible attempts to challenge the accuracy of the independent appraiser’s ultimate conclusion. The Stock Redemption Agreements provide that the results of the independent valuation “will be binding on both parties;” they bar Plaintiffs from challenging “the valuation or the preparation thereof.” Plaintiffs may not do indirectly, through a claim for breach of contract against Giner or a claim for tortious interference against Belt, what the Agreements bar them from doing directly.
Plaintiffs contend that Johnson’s final valuation was flawed for many reasons, including that Johnson did not properly understand the scope of his assignment or the nature of the assets that Giner still held after selling Giner ELX to Plug, was not aware that Giner’s largest stockholder thought the remaining assets of the company could be worth more than Johnson’s final valuation, misjudged Giner’s future business prospects, put too much weight on a discounted cash flow analysis of likely future revenues, and put too little weight on a “guideline transaction” analysis of sale prices of comparable companies. Plaintiffs offer and rely heavily upon a competing valuation by their retained expert which purports to correct Johnson’s analysis and recalculate Giner’s value.
But Plaintiffs may not sue Giner or Belt as a roundabout way to attack Johnson’s ultimate conclusion as to the Giner’s value.
“[W]hen parties enter into a contract providing that the valuation established by an independent appraiser shall determine the value of a property or business,” as in this case, “they express their ‘shared desire for finality’ through a means other than adjudication by a court or an arbitrator.” Buffalo-Water 1, LLC v. Fid. Real Est. Co., LLC, 481 Mass. 13, 23 (2018), quoting State Room, Inc. v. MA-60 State Associates, L.L.C., 84 Mass. App. Ct. 244, 249 (2013).
 
                                                            -4-
 
As a result, where parties agree by contract to be bound by an appraiser’s valuation of a property or business, “the correctness of the principles and methods of valuation adopted by an appraiser cannot be inquired into by the courts, in the absence of fraud, corruption, dishonesty or bad faith” (cleaned up). Buffalo-Water 1, supra, at 14, quoting Eliot v. Coulter, 322 Mass. 86, 91 (1947); accord Jordan Marsh Co. v. Beth Israel Hospital Ass’n, 331 Mass. 177, 186 (1954).
The Supreme Judicial Court has made clear that to invoke this standard a plaintiff must be able to establish “fraud, corruption, dishonesty, or bad faith by the individual appraiser,” not by someone else. Buffalo-Water 1, 481 Mass. at 14. (emphasis added). “Under this common-law rule, a judge may not invalidate ‘the determination of appraisers selected by agreement to resolve a dispute’ unless the appraisal process or decision was tainted on one of these four grounds.” Id., quoting Nelson v. Maiorana, 395 Mass. 87, 89 (1985).
Where parties delegate valuation of a business to a third-party, the appraiser may determine the proper valuation “upon such principles as [they] may see fit honestly to adopt, or upon such evidence as [they] may choose to receive.” Elliot, 322 Mass. at 89, quoting Palmer v. Clark, 106 Mass. 373, 389 (1871); accord Jordan Marsh Co., 331 Mass. at 186. The appraiser’s valuation “cannot be impeached for mistake arising in the judgment of the referee, or in drawing conclusions from evidence and observation.” McGurk v. Standard Plate Glass Co., 207 Mass. 583, 585 (1911), quoting Palmer, supra; accord Jordan Marsh Co., supra (valuation is “not made invalid by a mistake … as to law or fact”).
Plaintiffs have mustered no evidence of any fraud, corruption, dishonesty, or bad faith by Johnson. Since this is a key element of Plaintiffs’ attempt to set aside Johnson’s valuation, Defendants are entitled to summary judgment on all claims to the extent they are based on assertions that Johnson’s valuation or the manner in which he prepared it was flawed. See generally Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715 (1991) (“If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.”) (quoting Celotex Corp. v. Catret, 477 U.S. 317, 328 (1986) [White, J., concurring]).
2.2. Breach of Express Contract Terms. Giner is also entitled to summary judgment as to Plaintiffs’ assertions that Giner breached the Agreements by making a “challenge” to Johnson’s valuation and by depriving Plaintiffs of the fully “independent appraisal” that was allegedly promised in “pre-contractual representations.”
 
                                                            -5-
 
2.2.1. Giner Did Not “Challenge” the Final Valuation. The contract provision that the independent appraisal is binding and that the parties may not “challenge” it refers to the final results of Johnson’s work. That provision did not bar Giner from responding to Johnson’s requests for information, commenting on draft valuations, or otherwise communicating with Johnson as he was doing the analysis leading up to a final valuation.
Where written contracts are unambiguous when considered as a whole, as in this case, their meaning is a question of law that the Court may decide on a summary judgment motion. See Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002); Trustees of Beechwood Village Condominium Trust v. USAlliance Federal Credit Union, 95 Mass. App. Ct. 278, 284–285 (2019). “Whether a contract is ambiguous is also a question of law.” Eigerman v. Putnam Investments, Inc.,  450 Mass. 281, 287 (2007). Even if contract language is hard to parse, that does not make it ambiguous. See Sullivan v. Southland Life Ins. Co., 67 Mass. App. Ct. 439, 443 (2006).
That the parties disagree about how to read the Stock Redemption Agreements does not make them ambiguous either. “[A]mbiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other’s.” Indus Partners, LLC v. Intelligroup, Inc., 77 Mass. App. Ct. 793, 795 (2010) (affirming summary judgment), quoting Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999). A contracting party’s subjective understanding of what they thought their agreement provided cannot trump the plain meaning of unambiguous written contract terms. See, e.g., Eigerman, 450 Mass. at 288 n.8 (parties’ alleged “practical understanding” of how their agreement should be implemented cannot trump unambiguous contract language); Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 147 n.9 (2007) (parties’ subjective understanding of contract terms cannot create ambiguity); Herson v. New Boston Garden Corp., 40 Mass. App. Ct. 779, 791–792 (1996) (parties’ “personal understanding” of contract meaning “irrelevant” in deciding whether contract is ambiguous).
In context, the contractual provision that neither the Plaintiffs nor Giner “will challenge the valuation or the preparation thereof” means that, once the independent appraiser has finalized their valuation, neither side may go into court and seek to invalidate the results on the ground that the valuation or the manner in which it was prepared was flawed.
 
                                                            -6-
 
But neither this language nor any other provision in the Agreements barred Giner from providing information to Johnson or from engaging in the same kind of back-and-forth that Mittlesteadt and others at Giner had participated in during Johnson’s previous 409A valuations. If the parties wanted to limit Giner’s ability to communicate with Johnson while he was conducting his valuation analysis, and before he finalized his opinion, they could have included such a provision in their contracts. But that is not what the parties agreed to in this case.
The Court may not read into the Agreements new limitations on communicating with the independent appraiser that the parties could have adopted but chose not to include. See Automile Holdings, LLC  v. McGovern,  483 Mass. 797, 817 (2020) (“We cannot rewrite the contract to cure an oversight or relieve a party from the consequences of the failure to adhere to its plain terms.”) (quoting National Med. Care, Inc. v. Zigelbaum, 18 Mass. App. Ct. 570, 575–576 [1984]); Acushnet Company v. Beam, Inc., 92 Mass. App. Ct. 687, 695 (2018) (“Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.”) (quoting Vermont Teddy Bear Co. v. 438 Madison Realty Co., 1 N.Y.3d 470, 475 [2004]).
Instead, the plain and unambiguous language of each Stock Redemption Agreement “must be enforced according to its terms.” See A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 479 Mass. 419, 428 (2018), quoting Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). “[S]ophisticated parties are bound by the terms of their agreement. Even if the bargain they strike ends up a bad deal for one or both parties, the court’s role is to enforce the agreement as written.” Glaxo Grp. Ltd. v. DRIT LP, 248 A.3d 911, 919 (Del. 2021). Since Plaintiffs and Giner are sophisticated parties that “choose to embody their agreement in a carefully crafted document,” they must be “held to the language they chose.” Fronk v. Fowler, 71 Mass. App. Ct. 502, 508 (2008), quoting Anderson St. Assocs. v. Boston, 442 Mass. 812, 819 (2004).
2.2.2. Griner Did Not Breach a “Pre-Contractual” Promise. Plaintiffs contend that, in addition to the terms of each Stock Redemption Agreement, Giner made “pre-contractual representations” that Johnson would conduct an entirely “independent appraisal,” and that Giner allegedly breached this further promise by providing Johnson with information and commentary while he was doing his work.
 
                                                            -7-
 
This part of Plaintiffs’ contract claim fails because the Agreements are fully- integrated contracts, they do not impose on Giner any obligation to let Johnson do his work with no input from Giner, and Plaintiffs may not try to add to or alter the terms of these written contracts with extrinsic, parol evidence.
Where the parties intend their contract to be a fully integrated document, and the relevant terms of the contract are clear and unambiguous, no extrinsic evidence may be used to contradict, change, or create an ambiguity in the written terms of the contract. General Convention of New Jerusalem in the United States of America, Inc. v. MacKenzie, 449 Mass. 832, 835 (2007) (describing parol evidence rule). This rule applies if and only if court determines “that it has before it a written contract intended by the parties as a statement of their complete agreement.” Sound Techniques, Inc. v. Hoffman, 50 Mass. App. Ct. 425, 429 (2000).
“The rule that written agreements may not be varied or added to by parol evidence of antecedent or contemporaneous negotiations is not one merely of evidence, but is a rule of substantive law.” Id., quoting Kesslen Shoe Co. v. Philadelphia Fire & Marine Ins. Co., 295 Mass. 123, 129 (1936). The parol evidence rule “rests on the doctrine that when parties have deliberately put their agreements in the form of a written contract they shall not be allowed to show that the agreement was something else.” Glackin, 266 Mass. at 320, quoting Mears v. Smith, 199 Mass. 319, 322 (1908).
The undisputed facts that the Plaintiffs and Giner negotiated, agreed to, and signed written Stock Redemption Agreements that include all terms “necessary to constitute a contract” supports a strong “presum[ption] that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending it to be a complete and final statement of the whole transaction.” Realty Finance Holdings, LLC v. KS Shiraz Manager, LLC, 86 Mass. App. Ct. 242, 249 (2014), quoting Glackin v. Bennett, 226 Mass. 316, 319–320 (1917); accord, e.g., Berman v. Geller, 325 Mass. 377, 379-380 (1950). Where, as here, parties to an agreement “have reduced a contract to writing, it alone is presumed to express their final conclusions, and all previous and contemporaneous oral discussions or written memoranda are assumed to have been either rejected or merged in it.” Florimond Realty Co. v. Waye, 268 Mass. 475, 479 (1929).
Though the Agreements do not expressly state that they were intended to be fully integrated, an explicit merger or integration clause “is not required” to
 
                                                            -8-
 
establish that the parties intended for the written agreement to be a fully integrated document that contains all contract terms and conditions. Steinke v. Sungard Financial Systems, Inc., 121 F.3d 763, 771 n.5 (1st Cir. 1997), quoting Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs., 951 F.2d 1399, 1406 n.6 (3d Cir. 1991); accord, e.g., Home Ins. Co. v. Chicago and Northwestern Transp. Co., 56 F.3d 763, 767 (7th Cir. 1995). “The absence of an integration clause … does not necessarily mean that the parties did not intend the contract to be the final and complete expression of their agreement.” Carrow v. Arnold, 2006 WL 3289582, *5 (Del. Ch. Oct. 31, 2006).
Plaintiffs have mustered no evidence that could rebut the presumption that they and Giner intended for the Agreements to constitute a complete statement of the terms on which Giner would repurchase Plaintiffs’ shares in Giner. The summary judgment record contains no evidence suggesting that, in addition to the terms spelled out in the Agreements, Giner was also agreeing to be bound by additional terms alluded to during prior communications that were not included in the written contracts.
As a result, Plaintiffs cannot succeed in proving that Giner breached a “pre- contractual representation” that was not included in the written Stock Redemption Agreements, as any such representation was not contractually binding.
Plaintiffs’ conclusory assertion that they understood Giner would have to comply not only with the terms of the written Stock Purchase Agreements but also with additional terms alluded to during prior communications “does not create an issue of fact concerning integration.” Realty Finance Holdings, 86 Mass. App. Ct. at 250. Instead, given the presumption that a complete written contract is fully integrated, and the absence of any evidence that the parties intended for the Agreements to include additional terms not spelled out in the signed written documents, Plaintiffs may not point to extrinsic evidence to revise or add to the plain terms of the written Agreements. Id. at 251. “A judge uses summary judgment for the purpose for which it was intended when, as in this case, a party seeks to alter what the agreement provides by saying, in effect, ‘that was not what we meant at all.’ ” Id., quoting US Trust v. Henley & Warrant Mgmt., Inc., 40 Mass. App. Ct. 337, 343 (1996).
2.3. Breach of Implied Covenant. Since the Agreements did not bar Giner from providing information requested by Johnson or commenting on his tentative drafts, Giner did not violate the implied covenant of good faith and fair dealing
 
                                                            -9-
 
by doing so either. This implied covenant “does not create rights or duties beyond those the parties agreed to when they entered into the contract.” Boston Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs., 463 Mass. 447, 460 (2012) (affirming dismissal of claim), quoting Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 680 (2011).
“Parties that agree to be bound by an appraisal are free to set forth contractual terms regarding the appraiser's obligations and the grounds for invalidating the appraisal.” Buffalo-Water 1, 481 Mass. at 20. For example, Plaintiffs and Giner were “free to include provisions that establish more stringent impartiality requirements than those in our common law and specify that the appraisal will be invalid where those requirements are not met.” Id. at 27. The parties could also have agreed to bar all ex parte communications with the appraiser by either side, required that certain kinds of information be provided to or withheld from the appraiser, imposed other restrictions on the manner in which Giner or the Plaintiffs provided the appraiser with the information needed to value Giner’s assets, or barred Giner from responding to preliminary draft valuations.
Plaintiffs “may not insert these conditions” into their contracts with Giner “through the side door of the covenant of good faith and fair dealing.” Id. at 28. That is because this implied covenant “is only as broad as the contract that governs the particular relationship” and “cannot create rights and duties not otherwise provided for in the existing contractual relationship.” Id., quoting T.W. Nickerson, Inc. v. Fleet Nat’l Bank, 456 Mass. 562, 569–570 (2010).
2.4. Tortious Interference. Belt is entitled to summary judgment on the claim against him for intentional interference with contractual relations fails because, as discussed above, the record establishes that Giner did not breach the Plaintiffs’ Stock Redemption Agreements.[2] If the third party did not breach their contract, then a defendant cannot be held liable for tortiously interfering with a contract. See JNM Hospitality, Inc. v. McDaid, 90 Mass. App. Ct. 352, 354–
 
--------------------------------------------
 
[2] Though Count IV of the amended complaint is styled as a claim for “interference with contractual and advantageous relations,” Plaintiffs do not contend that Belt interfered with anything other than their contractual rights under the Stock Redemption Agreements. As result this claim must be for tortiously inducing a breach of contract, not for interfering with a non- contractual advantageous business relationship. See Cachopa v. Town of Stoughton, 72 Mass. App. Ct. 657, 658 n.3 (2008).
 
                                                            -10-
 
55 & 357 (2016) (where landlord did not breach lease by failing to make nonexclusive parking spaces available to customers of restaurant lessee, third party could not be liable for intentionally interfering with lease to detriment of tenant); Cavicchi v. Koski, 67 Mass. App. Ct. 654, 661 (2006) (where clients did not breach contingent fee agreements when they discharged attorney, new lawyer who convinced them to do so could not be liable for intentional interference with contract).
2.5. Breach of Fiduciary Duty. Defendants are entitled to summary judgment on the claim for breach of fiduciary duty for two, independent reasons.
2.5.1. Defendants Owed No Fiduciary Duty to the Plaintiffs. First, Plaintiffs have mustered no evidence showing that Giner or Belt owed any fiduciary duty to the Plaintiff shareholders.
The claim for breach of fiduciary duty against Giner fails because, under Massachusetts law, a corporation does not owe a fiduciary duty to its shareholders; a claim for breach of fiduciary duty may lie against majority shareholders that control the company, but not against the corporation. See Merola v. Exergen Corp., 423 Mass. 461, 463 n.3 (1996); accord, e.g., In re Solera Ins. Coverage Appeals, 240 A.3d 1121, 1135 & n.93 (Del. 2020) (well established that corporations do not owe fiduciary duties to their shareholders).[3]
As CEO and a director of Giner, Belt owed a fiduciary duty to Giner, the corporation. See In re Barrett, 447 Mass. 453, 464 (2006) (officers and directors owe fiduciary duty to protect interests of the corporation that they serve); Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1, 11 (1983) (senior executives are considered corporate fiduciaries and owe their company duty of loyalty).
 
--------------------------------------------
 
[3]    In Selmark Associates, Inc. v. Ehrlich, 467 Mass. 525, 526 (2014), the SJC affirmed a verdict in favor of a shareholder on his breach of fiduciary duty counterclaim against a corporation. But it appears that the issue of whether a corporation owes a fiduciary duty to its shareholders was never raised in Selmark, and the Court never overruled or even addressed its clear holding in Merola that corporations owe no such duty. As a result, Selmark does not hold that corporations owe a fiduciary duty to their shareholders. “The most that can be said is that the point was in the case[] if anyone had seen fit to raise it. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.” McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 719 n.12 (1990), quoting Webster v. Fall, 266 U.S. 507, 511 (1925).
 
                                                            -11-
 
But Belt owed a fiduciary duty only “to the corporation itself, and not its shareholders.” See International Brotherhood of Elec. Workers Local No. 129 Benefit Fund v. Tucci, 476 Mass. 553, 561 (2017); Jernberg v. Mann, 358 F.3d 131, 137 (1st Cir. 2004) (applying Massachusetts law); Goodwin v. Agassiz, 283 Mass. 358, 361 (1933). Belt therefore owed no fiduciary duty to the Plaintiffs.
There are exceptions where a director who is also a controlling shareholder “proposes and implements a self-interested transaction that is to the detriment of minority shareholders,” or where the corporation is closely-held and the director is also a shareholder. Tucci, 476 Mass. at 561–562.
Plaintiffs offer no evidence that either of these exceptions applies here, however. Indeed, Plaintiffs do not argue anywhere in their summary judgment memorandum that Belt owed a fiduciary duty to the Plaintiffs. Instead, they assert incorrectly that Giner owed such duty, though they rely entirely on caselaw discussing the fiduciary duty that majority shareholders in a closely- held corporation owe to the minority shareholders.
Plaintiffs’ assertion that Donahue holds “that officers and majority shareholders owe the minority a duty of utmost good faith” is incorrect. What the SJC actually held in that case is that “that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another.” Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 593 (1975) (emphasis added).
Plaintiffs highlight the further holding in Donahue that, when a closely-held corporation is repurchasing some of its own stock, “the stockholders, who, as directors or controlling stockholders, caused the corporation to enter into the stock purchase agreement, must have acted with the utmost good faith and loyalty to the other stockholders.” Id. at 598.
This holding is not implicated here because Plaintiffs have not sued the majority shareholders of Giner and present no evidence that Mr. Belt caused Giner to enter into the Stock Redemption Agreements. That Giner’s majority shareholders owed Plaintiffs a fiduciary duty has no bearing on whether Giner itself or Mr. Belt independently owed any such duty. For the reasons discussed above, they do not.
2.5.2. Plaintiffs’ Rights Are Set by Contract. In any case, even if Giner or Belt owed a fiduciary duty to the Plaintiffs (which they did not), Giner’s obligations in repurchasing shares of stock from the Plaintiffs are defined by contract. As a
 
                                                            -12-
 
result, Plaintiffs may sue only for breach of contract and may not also seek to hold Giner or Belt liable for breach of fiduciary duty.
“When rights of stockholders arise under a contract, … the obligations of the parties are determined by reference to contract law, and not by the fiduciary principles that would otherwise govern.” Chokel v. Genzyme Corp., 449 Mass. 272, 278 (2007). In other words, when a contested action by an alleged fiduciary “falls entirely within the scope of a contract,” any obligations derive from the contract and defendant’s conduct “is not subject to question under fiduciary duty principles.” Selmark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 537 (2014), quoting Chokel, supra; accord Merriam v. Demoulas Super Markets, Inc., 464 Mass. 721, 727 (2013).
3. The Smart Start Claim. Finally, Giner is also entitled to summary judgment on the claim that it breached the Stock Redemption Agreements by not paying each Plaintiff a share of the $8.1 million distribution that Smart Start made to Giner in June 2021.
The Agreements provided that Giner would only have to share with Plaintiffs proceeds received by Giner “from any sale” of its “Smart Start equity;” they did not require Giner to share a percentage of any other distribution or payment that Giner might receive from Smart Start.
The summary judgment record establishes that Giner did not sell any of its Smart Start equity until December 2021, and that the June 2021 distribution did not result from any such sale of equity. Instead, the challenged distribution came about because Smart Start’s controlling shareholder opted to recapitalize the company by taking on debt and using some of its proceeds to make distributions to the company’s shareholders.
Since the June 2021 payment by Smart Start was not proceeds from a sale of Giner’s equity, it was not covered by the Agreements and Giner had no contractual obligation to share that distribution with the Plaintiffs.[4]
Though Plaintiffs now wish they had struck a different deal, they are bound the plain language of their contracts. See, e.g., A.L. Prime Energy Consultant, 479 Mass. at 428. “Parties have a right to enter into good and bad contracts; the law enforces both.” Glaxo Grp., 248 A.3d at 919, quoting Nemec v. Shrader, 991
 
--------------------------------------------
 
[4] The Giner’s CFO may have mistakenly believed at the time that Giner was required to pay Plaintiffs proportional shares of the $8.1 million distributed by Smart Start in June 2021 is irrelevant.
 
                                                            -13-
 
A.2d 1120, 1126 (Del. 2010). As noted above, the Court cannot rewrite the Agreements “to cure an oversight or relieve a party from the consequences of the failure to adhere to its plain terms.” Automile Holdings, 483 Mass. at 817, quoting Zigelbaum, 18 Mass. App. Ct. at 575–576.
Plaintiffs’ invocation of the implied covenant of good faith and fair dealing is misplaced. Plaintiffs contend that, even if the express terms of the Agreements did not require Giner to share any part of the June 2021 distribution from Smart Start, not doing so violated “the spirit of the bargain it struck” and therefore constitute a breach of the implied covenant. That is incorrect. The covenant “does not supply terms that the parties were free to negotiate, but did not, nor does it ‘create rights and duties not otherwise provided’ for in the contract.” Eigerman, 450 Mass. at 288, quoting Chokel, 449 Mass. at 276 (citations omitted), quoting in turn Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005).
ORDER
Defendants’ motion for summary judgment is allowed. Final judgment shall enter stating that, this matter having come before the court (Ricciuti, J.) on an anti-SLAPP motion to dismiss the counterclaim and then come before the court (Salinger, J.) and a motion for summary judgment on Plaintiffs’ claims, it is ordered and adjudged that (1) Defendants’ counterclaim is dismissed with prejudice pursuant to G.L. c. 231, § 59H, and Defendants (if they have not already done so) shall pay the stipulated amount of $17,000 in attorneys’ fees, and (2) Plaintiffs shall take nothing on any of their claims.